614 So.2d 336 (1993)
Charles M. INABNET
v.
EXXON CORPORATION & CF Bean Corporation.
No. 91-CA-1947.
Court of Appeal of Louisiana, Fourth Circuit.
February 11, 1993.
Writ Granted April 30, 1993.
*337 Eric Lundin, III, Belle Chasse, for appellee.
Paul W. Wright, Maryanna Robinson, Vicky Neumeyer, New Orleans, for defendant/appellant.
Before SCHOTT, C.J., and BARRY, PLOTKIN, JONES and LANDRIEU, JJ.
JONES, Judge.
Defendant, Exxon Corporation, appeals the trial court's judgment finding it liable to plaintiff under La.C.C. article 667 in the amount of $733,476.91.
We adopt substantially the same findings of fact made by the trial court, reproduced herein.
On July 11, 1972 the State of Louisiana granted a surface lease of a portion of Bay Lanaux to Humble Oil and Refining Company, the predecessor company of the defendant Exxon. The purpose of the lease was for a tank battery and related purposes.
On August 14, 1972 and September 18, 1972 the State granted two separate rights of way permitting Humble to "cut, dig, dredge, deposit spoil on banks, build, construct *338 and maintain a canal" on the lands described in the instruments. That land was actually part of the bed of Bay Lanaux.
Thereafter in 1972 dredging operations were performed in the areas covered by the above referenced instruments. In 1978 maintenance dredging was also performed in certain other areas covered by those instruments.
On September 13, 1982 the State of Louisiana issued oyster lease No. 26482 to the plaintiff, Inabnet. This lease covered a portion of the bed of Bay Lanaux in Plaquemines Parish and "overlapped" some of the rights of way previously granted to Exxon in 1972.
Thereafter plaintiff marked his oyster lease in Bay Lanaux with willow poles and subsequently bedded a quantity of oysters on the lease.
In 1983 Exxon applied for and was granted a permit and appropriate letters of no objection to dredge, to enlarge and maintain a portion of the previously dredged canal and for other related purposes.
In September and October of 1983 the work contemplated by the 1983 permits was performed for Exxon by C.F. Bean Corporation.
In October 1983, Mr. Inabnet learned that an oil rig had gone across his lease. Together with Lt. Richard Barney, a Wildlife and Fisheries Enforcement agent, they observed a fresh spoil bank rising three or four feet out of the water along the western portion of plaintiff's lease. In the area where dredging had occurred there were no willow poles, which previously marked plaintiff's lease. Lt. Barney observed a large portion of oyster shells in the spoil bank and birds flying around and sitting "on what was plaintiff's oyster lease."
Plaintiff filed this action on October 4, 1984 to recover for damages sustained as a result of dredging and boating operations performed by the defendants Exxon and C.F. Bean Corporation in 1983. Plaintiff subsequently settled with and dismissed C.F. Bean Corporation. On February 8, 1988, applying negligence principles, the district court rendered judgment in favor of Exxon dismissing plaintiff's action at his costs on the grounds that the dredging operations complained of were performed by an independent contractor whom Exxon had no duty to supervise and over whom Exxon had no control. Further, the trial court found that the smaller vessels alleged to have caused damage to plaintiff's oyster beds were likewise supplied and operated by independent contractors for whose acts Exxon was not liable.
On February 18, 1988, plaintiff filed a Motion for a New Trial or Amended Judgment premised on a theory of liability under La.C.C. article 667. It's motion was granted and judgment rendered in favor of the plaintiff in the amount of seven hundred thirty-three thousand four hundred seventy-six and 91/100 dollars ($733,476.91) from the record made at the original trial. From this judgment Exxon appeals.
Texaco, Inc., Chevron U.S.A., Tidewater Marine and Tennessee Gas Pipeline Co. filed an amicus curiae brief challenging the trial court's finding that La.C.C. article 667 was applicable to the facts of this case and that plaintiff was entitled to restoration costs for the damages he allegedly sustained.
By its first assignment of error, the trial court acknowledged in its reasons for judgment that it did not consider plaintiff's strict liability claims when it first rendered judgment in this case. However, while plaintiff's motion for new trial was pending the Louisiana Supreme Court rendered its decision in Butler v. Baber, 529 So.2d 374 (La.1988) which applied the strict liability principle of Civil Code Article 667 to damages sustained by oyster lessees as a result of the activities of neighboring or overlapping mineral lessees. The court recognized Butler as precedent to the instant case.
Exxon and parties in the amicus brief argue that Butler is distinguishable because it is limited to facts where the oyster lease pre-existed the mineral lease and the mineral lease is therefore subservient to it. This is not the case. La.C.C. article 667 establishes a limitation on the *339 owner's use of his property. The proprietor of an estate cannot make any work on it which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of damage to him. A violation of article 667 does not require proof of negligence because the fault is the damage to neighboring property. Finding that plaintiff proved damage and causation, the trial court was correct in holding Exxon strictly liable under article 667.
By its second assignment of error, Exxon argues that plaintiff failed to prove a causal relationship between the injury he allegedly suffered and its oilfield operations. Exxon offered only a single expert, Dr. Kilgen, to refute plaintiff's many eye-witnesses and independent investigators from the Wildlife and Fisheries Department who testified to injury to the leasebed resulting from dredging and traffic. Even Dr. Kilgen acknowledged that the dredging of the access channel and depositing of the spoil bank caused damage to plaintiff's oyster lease. Dr. Kilgen stated that he had difficulty in evaluating how much damage was a result of these causes because he found so few oysters to sample and there were several other alleged causes that could account for the unusually high mortality rate amongst the oysters he did sample. In addition to such natural causes as fresh water intrusion, predators and diseases there was such man-made intervention as oyster drilling and boats grounding that were alleged as well as Exxon's dredging and spoil bank deposit.
Finally, Dr. Kilgen testified that without more precise information about the water bottoms prior to the 1983 dredging and spoil bank deposit he was not inclined to characterize plaintiff's oyster lease as one with a substantial commercially harvestable crop; merely as a lease with potential. It was Dr. Kilgen's position that in the area of plaintiff's lease the water bottoms tended to be silty sand and therefore not conducive for oyster production without the creation of reefs.
The trial court specifically rejected Dr. Kilgen's opinion on this matter. In its reasons for judgment, the trial court stated that it found the testimony of Noel Brodtman, plaintiff's witness, to be quite convincing. The trial court wrote:
He described the bottoms in the lease as "marsh mat" and anoxic peat which does not decay or consolidate but which has the ability to support a relatively high density of material like an oyster reef.
The trial court also noted that Mr. Brodtman's testimony was corroborated by Mr. Ancelet, an expert witness employed by the Department of Wildlife and Fisheries.
Finding that the original conditions of plaintiff's lease were as he alleged, the trial court concluded that it was Exxon's use of its property rights that had caused the damages complained of. Specifically the trial court found that,
[t]his record is undisputed that Exxon's activities in the exercise of its surface lease and more particularly its canal right of way caused damage to Mr. Inabnet's oyster lease. First, the mere digging of the canal made a substantial portion (7.3 acres) of the lease's water bottoms unsuitable for oyster cultivation. (The Court notes parenthetically that a portion of the canal extended beyond the Exxon right of way.) Then, another substantial portion (5.1 acres) was made unproductive by virtue of the creation of a spoil bank where the dredge spoil was deposited. Another 13.8 acres of the lease was adversely affected by slumped spoil coming from the constant but gradual erosion of the spoil bank. Also a portion of that slumped spoil area (about 2.8 acres) is in an area that remains constantly disturbed and thus unsuited for oyster cultivation as a result of vessel traffic that services Exxon's facilities in the vicinity of plaintiff's oyster lease. The court finds it incredulous to suggest that the water bottoms of the lease sub judice could be dug up and piled up in a spoil bank which will gradually erode over a long time without causing damage to the water bottoms constituting the lease itself as well as to any crop of oysters which may have been planted or growing thereon.
*340 Although defendant alleges other sources of damages to plaintiff's oyster lease, none of these were proven. Plaintiff denied that Hurricane Juan had any impact on his oyster lease. He admitted that a rig doing work for Sunbelt grounded on his lease for which he received a settlement award of $2,000.00. However, he claims that this was in an area separate and apart from Exxon's operations. We find no manifest error with the trial court's reasoning that the damage complained of was caused by Exxon.
By its third assignment of error, Exxon and the parties to the amicus brief argue that the trial court erred in awarding restoration costs to plaintiff when he is but a leaseholder of the waterbottoms and not the proper party to sue for restoration costs. They further challenge the amount of the award which they allege exceeds the fair market value of the property destroyed.
The trial court relied on Tesvich v. 3-A's Towing Company, 547 So.2d 1106 (La.App. 4th Cir.) writ denied 552 So.2d 383 and 384 (La.1989) in awarding restoration costs. The trial court reasoned that whether reconstruction is necessary is a factual determination left to the trial court's evaluation of the evidence and the credibility of witnesses. However, the issue here is not whether reconstruction costs should be allowed but to whom and in what amount.
Exxon and the parties to the amicus brief cite Farac v. Gulf Oil Corp., 806 F.2d 260 (5th Cir.1986) which provides:
It is the state, as owner of the oyster beds, rather than the holder of the leasehold interest in the beds that should seek restoration or the cost thereof.
The logic behind this approach is to avoid exposing the mineral lessee to double liability should the state seek to enforce its right to have the property restored. Further, in its judgment the trial court failed to stipulate that the monies be spent to restore the property making the likelihood of double liability even greater.
Plaintiff responds that Farac is contrary to Louisiana law. La.R.S. 56:423(B) provides that all claims for "wrongful or negligent injury or damage to the beds or grounds under lease" to a lessee of oyster beds or grounds, when the oyster lessee has obtained, recorded and marked his lease, belong to the oyster lessee and not the State. The State is not even a party to this litigation so plaintiff contends it would be improper to escrow or award repair damages to the State.
In contesting the amount of the award, Exxon and the parties to the amicus brief argue that it is purely speculative. The experts tendered in this case never reconstructed an oyster lease and relied upon theory that has never been proven. Further, they argue that the amount awarded is greater than the fair market value of the property destroyed. Therefore, plaintiff is only entitled to the difference in value prior to, and following, the damage. They cite Ewell v. Petro Processors of Louisiana, Inc., 364 So.2d 604 (La.App. 1st Cir.1978) which held that a jury is not allowed to consider reconstruction cost as a proper measure of damages when the cost of reconstruction greatly outweighs the fair market value of the property.
The facts of the Ewell case involved a swamp that was destroyed by a chemical spill and not an oyster leasehold which is an income producing property who's value hinges on its restoration back to productivity. Ewell does not appear to be controlling. Plaintiff argues Exxon failed to offer evidence of the value of the property before and after the dredging and it bears the burden of proof on a limitation of liability defense. Also, plaintiff attempts to distinguish Ewell on grounds that restoration was found to be impracticable in that case and no such finding was made by the trial court in the instant case.
We agree that plaintiff is entitled to some restoration costs. Exxon failed to put on any evidence concerning restoration costs and the trial court adopted the testimony of plaintiff's expert in total, awarding plaintiff $523,380.00 or $37,000.00 for removal of the spoil bank, $63,000.00 for disposal of the spoil bank and $423,380.00 for a six-inch shell covering over a 26¼ acre damage site. Whether plaintiff is entitled *341 to a shell covering to that extent was not established.
Plaintiff conceded that his oyster cultivation efforts were concentrated on a small area of his lease because the current flow in that area made the water conditions excellent for oyster growth. Plaintiff's assistant, Tommy Foret, admitted that the balance of plaintiff's lease was not bedded because the water bottoms were too soft. Dr. Kilgen, Exxon's expert, could not measure the precise area of plaintiff's lease that was destroyed because there was nothing to indicate whether any of the balance of the lease was capable of sustaining oysters. It was therefore speculative at best for the trial court to find that plaintiff was entitled to a shell covering over 26¼ acres. Furthermore, we find that it was inconsistent for the trial court to conclude that Exxon's operations had damaged 26¼ acres of water bottoms and yet find that only 16 acres were productive when awarding damages for loss of production. If the balance of the 26¼ acres was not productive, how was plaintiff damaged by Exxon's operations in that area? In order to make plaintiff whole, only 16 acres of his leasehold has to be restored. Because 16 is 60.9 per cent of 26.25, we calculate that plaintiff is entitled to 60.9 per cent of $423,380.00 or $254,028.00 for a shell covering of the damage site. We affirm the trial court's award for removal and disposal of the spoil bank for a total of $354,028.00 in restoration costs.
The trial court awarded plaintiff $21,360.00 for destroyed seed oysters (3,560 sacks at $6.00/sack). The court arrived at this number after determining that plaintiff's request for $10.00/sack was unreasonable. In its reasons for judgment the trial court stated that it "finds it difficult to believe that having been so recently planted their value in the water could so closely approximate the value of a mature harvested sack of oysters." It found that a fair value of the destroyed oysters was no more than $6.00/sack. The plaintiff actually planted 5,000 sacks but is only entitled to 71.2% of his planting because as demonstrated by samples taken by the experts, a portion of plaintiff's seed oysters have survived. We find that the trial court's award for destroyed seed oysters is supported by the record.
Likewise, the trial court's award for loss of production was well-reasoned and supported by the record. It found that plaintiff had sustained a loss of $188,736.91 for the years 1984-1987. The award was based on estimated amounts of production at an average price per sack per year less production costs. The trial court found that plaintiff's expert, Mr. Brodtman, offered average price per sack figures that were a little too high. The record contained testimony from the plaintiff and another of his witnesses, Mathew J. Farrac, Jr., who is also an oyster fisherman, concerning the average price per sack for each given year. Their testimony was relatively close but the trial court adopted the figures provided by plaintiff because Mr. Farrac tended to generalize.
Exxon's expert, Dr. Kilgen, did not offer an average price per sack. Instead he recommended that plaintiff's damages be based on the amounts normally offered in the industry in settlement proceedings for damaged oyster leases; $10 per sack. The trial court properly disregarded this position. In light of Exxon's failure to put on any evidence controverting plaintiff's testimony of average price per sack and because plaintiff's testimony seems reasonable, we cannot say that the trial court erred in relying on it when computing total loss of production.
We also find that the trial court correctly awarded only 66.67% of the total loss of production each year, thereby accounting for production costs. There was no disagreement amongst the experts that production costs usually amounted to 1/3 of the value of the sack produced.
The trial court further limited plaintiff's recovery to 71.2% of expected productivity because it recognized that plaintiff did not lose 100% of its seed oysters. The experts testified that some live and healthy samples survived on plaintiff's lease. Using their sample calculations it was determined that 71.2% was destroyed. The award for *342 total loss of production is correct in all respects.
We reverse the trial court's award for restoration costs. We find that plaintiff is entitled to a six-inch shell covering over a 16 acre damage site, as opposed to 26¼ acres, and we calculate the cost to be $254,028.00. We affirm all other aspects of the trial court's judgment; specifically the award of $37,000.00 for removal of the spoil bank, the award of $63,000.00 for disposal of the spoil bank, the award of $21,360.00 for the destruction of seed oysters and the award of $188,736.91 for loss of production.
For the foregoing reasons, we affirm the trial court's judgment finding Exxon Corporation liable to plaintiff under La.C.C. art. 667, but reverse the total award of $733,476.91 and render an award of $564,124.91 plus interest.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
SCHOTT, Chief Judge, dissenting in part:
I respectfully dissent from my colleagues' treatment of Butler v. Baber, 529 So.2d 374 (La.1988) and their awards for restoration costs and loss of profits.
Exxon's oil and mineral lease were in place for many years before plaintiff took his oyster lease. The canal cutting SW to NE across Bay Lanaux had been dug long before plaintiff took his lease. Exxon's lease was on the public record and its activities on the lease were obvious when plaintiff took his lease. After plaintiff took his lease Exxon redredged its canal. In doing so it more than doubled the width of the canal on the western side and it deposited a huge spoil bank on the eastern side which was contrary to its permit. Butler v. Baber entitles plaintiff to recover damages resulting from that part of this redredging activity which was outside the limits and scope of their original lease, but not for damages already in place before plaintiff took his lease or for damages which were not the result of the redredging.
Plaintiff placed in evidence a survey showing 26¼ acres for which the trial court awarded reconstruction costs. This includes 3.023 acres consisting of EXXON's original canal and 2.8 acres designated as a "prop wash" area by plaintiff's expert, Brodtman. This latter area was in use by vessel traffic serving EXXON's facilities for many years before plaintiff took his oyster lease. Since EXXON's occupation of these areas began and was ongoing before the oyster lease began Butler v. Baber does not authorize plaintiff's recovery for restoration of this area of 5.8 acres. On the other hand plaintiff is entitled to restoration of the 4.28 EXXON dredged outside of the limits of the original canal and 5.14 acres occupied by the spoil bank east of the canal. As to the remaining eleven acres Brodtman testified that this area adjacent to and east of the spoil bank was ruined for oyster production because loose soil from the bank would "slump" over this area. EXXON's assertion that this slumping would have occurred anyway from previous dredging is not supported by the record. Therefore, this part of the trial court's award is authorized by Butler v. Baber.
Next, I submit that the record does not support the trial court's award for loss of profits as to sixteen acres.
Plaintiff's oyster lease covered 86 acres in Bay Lanaux. According to plaintiff's own testimony and his other evidence he planted seed oysters only along the southern shore of his lease. He said it was only in the area south of the Freeport Canal. Based upon information gleaned from plaintiff and his employee as well as tests he made Exxon's expert, Dr. Kilgen, estimated that the plaintiff had seeded along the south shore a distance of 250 feet out from the shore. The trial court accepted Dr. Kilgen's testimony which was to the effect that oyster production on the west side of the lease was unaffected by Exxon's redredging. This was also consistent with Brodtman's opinion that only the spoil area itself and the "slumped soil spread area" were affected.
The trial court based its award for loss of production on the lost return to plaintiff *343 on his efforts in planting seed oysters. The south shore line of plaintiff's lease seems to be at least 2300' long, but only 977' (round to 1000') lies to the south of the areas adversely affected by the redredging. Consequently, plaintiff is entitled to 10/23 of the amount of the award for loss of profits.
Accordingly, I would reduce the award for restoration by reducing the 26¼ acres to be restored by 5.8 acres or 22%. This results in an award of $330,236 (78% × 423,380) for spreading shells and $100,000 for removal of the spoil bank. I would award 10/23 or 43% of the $188,737 awarded by the trial court for the loss of profits or $81,157. Consequently, I would amend the judgment of the trial court to:

RESTORATION COSTS $430,236.00
DESTRUCTION OF SEED
 OYSTERS 21,360.00
LOSS OF PRODUCTION 81,157.00
 ____________
 TOTAL $532,753.00

LANDRIEU, Judge, dissenting in part:
I concur with the majority opinion in its assessment of liability but respectfully dissent with regard to the damages awarded.
An award of $564,124.91 for the damages sustained by the plaintiff shocks the conscience. Plaintiff obtained an oyster lease from the State at an annual rental of $2.00 per acre, spread $21,360.00 of seed oysters, never harvested an oyster and is awarded damages as follows:

Restoration of water bottom $254,028.00
Removal of spoil bank 37,000.00
Disposal of spoil bank 63,000.00
Destruction of seed oysters 21,360.00
Loss of production 188,736.91
 ___________
 $564,124.91

The trial court, as well as the majority, relying on Tesvich v. 3-A's Towing Company, 547 So.2d 1106 (La.App. 4th Cir. 1989), writs denied 552 So.2d 383 and 552 So.2d 384 (La.1989), has used a flawed method to calculate plaintiff's loss.
La.Rev.Stat.Ann. § 56:423 B(1) (West Supp.1992) gives a lessee of oyster beds or grounds the right to maintain an action for damage to the beds or grounds. It does not give to the lessee the State's right to recover for damage to the water bottoms. If lessee had not seeded the area, it can be assumed the majority would have awarded him the same damages less $21,360.00. If the majority's calculations are correct, the State's water bottoms have been damaged to the extent of $354,028.00, but the award is made to the lessee who is under no obligation to make the restoration and, presumably, will not.
The appropriate measure of lessee's damages is the difference between the market value of his lease immediately before the damage and the market value of his lease immediately after the damage. This is ascertainable by expert testimony. Lessee would also be entitled to loss of income for the period between the date of the damage and a date when a substitute lease could be obtained from the state or purchased on the open market.
The majority, in addition to using a flawed methodology to compute damages, awards $188,736.91 for loss of production without deducting the value of lessee's labor and additional seed oysters that would have been required to sustain that production.
If lessee's reasonable anticipated annual profit was accumulated through the remaining 13 years of the lease and discounted at a fair rate back to the date of the damage, the award would be substantially less than that affirmed.
I would remand the case to the trial court for the purpose of establishing by an acceptable methodology the damages due the lessee to his leasehold and would not award him damages due the State for restoration of its water bottoms.