642 So.2d 1243 (1994)
Charles M. INABNET
v.
EXXON CORPORATION.
No. 93-C-0681.
Supreme Court of Louisiana.
September 6, 1994.
Rehearing Denied October 6, 1994.
*1245 Robert B. McNeal, Vicky G. Neumeyer, New Orleans, for plaintiff.
W. Eric Lundin, III, Belle Chasse, for respondent.
Grady S. Hurley, New Orleans, John Donellan Fitzmorris, Jr., Santa Barbara, CA, for Texaco Inc., amicus curiae.
Philip Francis Cossich, Jr., Belle Chasse, for East Plaquemine Fishmen, Louisiana Oyster Dealers, Organization La. Fishmen, Plaquemine Oyster Ass'n, Southwest Pass Oyster Ass'n, Terrebonne Parish Oyster Ass'n, amicus curiae.
LEMMON, Justice.[*]
This action involves a dispute between two parties, the holder of an oyster lease and the holder of a surface lease and servitude, who separately held rights to immovable property under contracts from the State of Louisiana. Plaintiff, the oyster lessee, sought to recover damages to his oyster lease caused by dredging operations conducted by an independent contractor for Exxon Corporation, who held a surface lease and canal right-of-way that predated and overlapped plaintiff's oyster lease. The principal issues include (1) the correlative rights and obligations of the two parties, both as holders of coexisting rights to the same property and as holders of rights on neighboring properties, and (2) the right of the oyster lessee to recover the cost of restoring the State's water bottoms that were damaged by the dredging operations.

Facts
In 1972, the State of Louisiana granted Exxon a surface lease of 3.63 acres on Bay Lanaux for the purpose of constructing and maintaining a tank battery and related facilities for the handling, storing and transportation of oil, gas and other minerals.[1] The lease further granted Exxon "the right to dig water wells, dredge canals and install and construct any other structures on said premises...." (Emphasis added.) The lease was for twenty-five years, with options for another twenty-five years, at $108.90 per year. Exxon agreed to pay the State the "full value of all damages to the premises...."
Shortly thereafter, the State granted Exxon, in two instruments and for the total sum of $1,150, a right-of-way across Bay Lanaux, with the right "to cut, dig, dredge, deposit spoil on banks, build, construct and maintain a canal" on the right-of-way.[2] The U-shaped right-of-way was sixty-five feet wide and covered a total of 4.57 acres, extending in a northeast-to-southwest direction approximately 1,613 feet from the north shore to the south shore of Bay Lanaux, then turning northwest to form the bottom of the "U," and then turning northeast to the tank battery, *1246 as shown (along with plaintiff's oyster lease) on the following diagram which has been revised from an attachment to Exxon's brief:[3]

*1247 In each contract, Exxon was expressly relieved of any obligation to restore the property to its original condition at the expiration of the agreement, and the State reserved the right to use the property for any use that did not interfere with Exxon's rights.
Pursuant to these right-of-way contracts and to a permit issued by the United States Corps of Engineers, Exxon dredged the canal and constructed the tank battery later in 1972. According to the drawing attached to the 1972 permit from the Corps of Engineers, the canal was to be sixty-five feet wide and the spoil from dredging the western section of the canal was to be spread so that the natural bottom of the bay was not raised more than one-half foot. Of course, the federal permit could not convey property rights, and the record does not show that the State authorized the placing of dredged materials in the bay, either by spreading or by establishing a spoil bank.
In 1978, Exxon performed maintenance dredging of the canal. The drawing attached to the permit from the Corps of Engineers showed a canal sixty-five feet wide and a requirement that the spoil dredged from the bay was to be spread so that the natural depth would not be decreased more than six inches.[4] The permit drawing allowed a spoil bank only in the area where the dredging was on land north of Bay Lanaux.
In 1982, the State granted plaintiff an oyster lease which covered eighty-four acres of Bay Lanaux and which overlapped Exxon's existing right-of-way and partially overlapped Exxon's existing surface lease, as shown in the foregoing diagram. The lease, which was for fifteen years at $2.00 per acre per year, was "for oyster purposes" and was subject to the provisions of La.Rev.Stat. 56:424-430. Plaintiff planted approximately 5,000 sacks of seed oysters on about sixteen acres along the southern shore of Bay Lanaux in late 1982 and early 1983, and expected to harvest his first oysters in 1984.
In 1983, Exxon decided to drill a well in the marsh north of Bay Lanaux and to use the eastern section of the canal for access to the well location.[5] Exxon contracted with C.F. Bean Corporation to perform the dredging operations. After Exxon surveyed the right-of-way and marked it with stakes and flags, Bean performed the dredging between September 26 and October 2, 1983. Bean dredged the canal to a width of 120 feet (almost double the width of the right-of-way) and deposited the soil to form a spoil bank outside of and along the southeast boundary of the right-of-way. There was conflicting evidence about the existence in the dredging area of physical markers indicating the boundaries of the oyster lease, as required by La.Rev.Stat. 56:430 B(1). There was also evidence that commercial and pleasure boats crossed plaintiff's lease extensively before and after the dredging by Bean.
Plaintiff filed this action against Exxon and Bean, claiming that Bean's dredging had dug up part of his oyster beds and deposited spoil on other parts, damaging the oysters and the beds. He further claimed silt damage caused by Exxon's vessels that serviced the tank battery. He sought to recover his damage for the loss of his seed oysters and the loss of reasonably anticipated income, as well as for the cost of restoring the water bottoms to the condition where they would support oyster beds.
Prior to trial, plaintiff compromised his claim against Bean. He then proceeded to trial against Exxon.
The trial court initially ruled in favor of Exxon, finding that Bean was an independent contractor and that Exxon was neither liable vicariously for Bean's torts nor independently on the basis of its own negligence. However, while plaintiff's motion for new trial was pending, this court rendered the decision *1248 in Butler v. Baber, 529 So.2d 374 (La.1988), holding that strict liability can be imposed on a mineral lessee who, without negligence under usual standards, causes damage to oyster beds coexisting on the property subject to the mineral lease. Relying on the Butler decision, the trial court granted a new trial and rendered judgment in favor of plaintiff based on strict liability under La.Civ.Code art. 667. The court found that Exxon's dredging of 7.3 acres on and west of its right-of-way and its establishment of a spoil bank on an additional 5.1 acres destroyed the marsh mat which was needed to support the load of an oyster reef, and that the slumped spoil spread over 13.8 acres east of the spoil bank made that area unattractive for spat set and therefore unsuitable for oyster production.[6] Thus, the court found that a total of over twenty-six acres needed to be restored, as shown on the following annotated record drawing:
*1249 
The court found that the dredging destroyed the seed oysters on about seventy-one percent of the sixteen acres planted by plaintiff and awarded damages in the amount of $733,477, including $21,360 for the value of the destroyed seed oysters[7] and $188,737 for loss of income from anticipated oyster production for the years 1984-87.[8] The remainder of the award was for restoration of the damaged water bottoms, consisting of $37,000 *1250 for removal of the spoil bank, $63,000 for proper disposal of the spoil, and $423,380 for establishment of a six-inch shell mat over the twenty-six acres of damaged water bottoms.
The court of appeal, with a five-judge panel in which two judges dissented, affirmed the judgment on liability under Article 667, but reduced the restoration damages by $169,352 to $254,028. 614 So.2d 336. The court of appeal noted that the trial court, while finding that the dredging operations had damaged twenty-six and one-fourth acres of water bottoms, inconsistently found that only sixteen acres were productive when awarding damages for loss of income from production. The intermediate court concluded that only sixteen acres had to be restored "[i]n order to make plaintiff whole," and reduced the cost of restoration by 16/26.25. 614 So.2d at 341.
On Exxon's application, this court granted certiorari to review the judgments of the lower courts. 618 So.2d 397.

Dual Relationship between the Parties
The parties stand in a dual relationship in the present case. On one part of the oyster lease, plaintiff and Exxon had the relationship of two parties with coexisting rights to the same property. On the remainder of the oyster lease, Exxon held no property rights and was simply plaintiff's neighbor. We will therefore analyze plaintiff's claims against Exxon separately in each relationship.
The first claim against Exxon is for damage to that property on which plaintiff and Exxon held coexisting rights; that is, the portion of plaintiff's oyster lease which overlapped Exxon's servitude and surface lease. This claim will be analyzed in the context of the correlative rights of parties holding separate rights from the landowner at the same time on the same property, and the court will consider the applicability of La.Civ.Code arts. 667-669 to parties in this relationship.
The second claim against Exxon is for damage to that property in plaintiff's oyster lease adjoining the servitude and surface lease that Exxon acquired from the State; that is, all property leased by plaintiff outside the boundaries of Exxon's servitude and surface lease, and on which Exxon had no express property rights. This claim will be analyzed in the context of the rights and obligations of adjoining landowners, and the court will consider the applicability of La.Civ. Code arts. 667-669 to parties in this relationship.

Civil Code Articles 667-669
While the owner of immovable property (or a person deriving his rights from the owner) generally has the right to use the property as he or she pleases, the owner's right may be limited if the use causes damage to neighbors (and others). The corresponding rights and obligations of neighboring proprietors, arising from that relationship, are principally governed by La.Civ. Code arts. 667-669, which provide:
Article 667
Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
Article 668
Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.
Article 669
If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.
Articles 667-669 place limitations on the rights of owners by setting out principles *1251 of responsibility applying the doctrine of sic utere tuum ut alienum non laedas, which requires an owner to use his property in such a manner as not to injure another. 4 A.N. Yiannopoulos, Louisiana Civil Law TreatisePredial Servitudes §§ 25, 33 (1983). Article 667 prohibits uses which cause damage to neighbors or deprive them of the enjoyment of their property, while Article 668 permits uses which merely cause neighbors some inconvenience. Id. at § 34. Article 669 allows suppression of certain inconveniences, if excessive under local ordinances and customs, and requires tolerance of lesser inconveniences. Together, the three articles establish the following principles:
No one may use his property so as to cause damage to another or to interfere substantially with the enjoyment of another's property (Article 667). Landowners must necessarily be exposed to some inconveniences arising from the normal exercise of the right of ownership by a neighbor (Article 668). Excessive inconveniences caused by the emission of industrial smoke, odors, noise, dust, vapors and the like need not be tolerated in the absence of a conventional servitude; whether an inconvenience is excessive or not is to be determined in the light of local ordinances and customs (Article 669).
Id. at § 34.
Articles 667-669, while setting standards of responsibility for a landowner to his neighbors, do not purport to impose delictual liability for violation of the standards and do not specify whether responsibility is founded on negligence, intentional misconduct, or abuse of right. However, judicial decisions have clarified that conduct by a proprietor violative of Articles 667-669 may give rise to delictual liability, without negligence, as a species of fault within the meaning of La.Civ. Code art. 2315. See, e.g., Chaney v. Travelers Ins. Co., 259 La. 1, 249 So.2d 181 (1971) (holding that a landowner was liable for damage to a neighbor caused by use of heavy equipment in canal improvements, although the work was done prudently by usual standards).
The concept has emerged that Article 2315 establishes delictual responsibility for injury to others through "fault," a term encompassing more than negligence or other blameworthy conduct and including violations of standards of conduct set out in the Civil Code and the statutes to govern the responsibility of persons in certain relationships and arising from certain activities. See, e.g., Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133 (1971) (imposing delictual liability under Article 2315 for fault as analogized from the conduct required by Article 669, when gas escaped from a ruptured pipe which, without regard to negligence, caused damages). The courts have referred to Articles 667-669 to determine the conduct which constitutes "fault" under Article 2315 in the context of neighboring proprietors. See State of La., Through Dept. of Transp. and Dev. v. Chambers Inv. Co., 595 So.2d 598 (La.1992) (holding that a property owner could not recover from an expropriating authority the damages related to the delayed development of the property because there was no evidence of physical damage or injury to the property and no evidence of ultrahazardous activity or excessive or abusive conduct which exceeded the level of inconvenience which a neighbor must tolerate under Article 668).
The term "proprietor" in Article 667 also has been expansively interpreted by the courts to apply not only to a landowner, but also to a person whose rights derive from the owner. See, e.g., Lombard v. Sewerage and Water Bd. of New Orleans, 284 So.2d 905 (La.1973); see generally Ferdinand F. Stone, Tort Doctrine in Louisiana: The Obligations of Neighborhood, 40 Tul.L.Rev. 701, 711 (1966). Therefore, delictual actions under Article 2315, based on conduct which violates the obligations of Articles 667-669 not to use one's property so as to cause damage to neighbors or to deprive neighbors of the enjoyment of their property, may be brought by persons holding rights derived from the landowner or against such persons.
In summary, this court has used Articles 667-669 by analogy to determine the type of conduct which gives rise to liability without proof of negligence when activity by one party holding a right to immovable property has caused damages to a party holding a *1252 right to neighboring property. Liability generally has been imposed for fault under Article 2315 by analogy to the conduct required by Articles 667-669, despite the absence of negligence in the proprietor's conduct. Hero Lands Co. v. Texaco, Inc., 310 So.2d 93 (La. 1975); Lombard v. Sewerage and Water Bd. of New Orleans, 284 So.2d 905 (La.1973); Chaney v. Travelers Ins. Co., 259 La. 1, 249 So.2d 181 (1971); Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133 (1971). See also D'Albora v. Tulane Univ., 274 So.2d 825 (La.App. 4th Cir.), cert. denied, 278 So.2d 504, 505 (La.1973).
In Butler v. Baber, 529 So.2d 374 (La. 1988), this court considered whether liability could be imposed without proof of negligence under Article 2315, by analogy to the conduct required by Articles 667-669, when the plaintiff oyster lessee and the defendant mineral lessee held coexisting rights from the owner to the same immovable property and therefore were not literally "neighbors." The majority, holding that co-lessees of the same property can be neighbors within the contemplation of Article 667, required only proof of damages and causation. The concurring opinion, while reaching the same result, pointed out that other codal and statutory rules and legal principles may come into play in determining by analogy the conduct that gives rise to delictual liability of the mineral lessee to the oyster lessee of the same property. The concurring opinion particularly referred to La.Rev.Stat. 31:11, which requires the owner of land burdened by a mineral right and the owner of the mineral right to exercise their respective rights with "reasonable regard" for those of the other, and to La.Rev.Stat. 31:22, which has been applied to limit a mineral lessee to using only so much of the land as is reasonably necessary for his operation and to restore the property to its original condition as far as practicable, unless the parties contract otherwise.
In the present case, Exxon urges us to reconsider the Butler decision and to apply the negligence standard or to adopt the "reasonable regard" rule of the concurring opinion.
In reconsidering Butler, we agree with the concurring opinion that the portion of the Butler decision hinging liability of a mineral lessee to an oyster lessee of the same property on proof only of causation and damages reached the correct result in that case, but was an oversimplification of a complex problem. A court, in formulating standards of strict liability, should conduct an objective search for a rule to govern the case, looking for analogies among codal and statutory rules, principles, concepts and doctrines, and taking into account all of the social, moral, economic and other considerations that an objective rule maker would consider in forming a rule to govern the case. Butler v. Baber, 529 So.2d 374, 382 (La.1988) (Dennis, J., concurring). Although Butler correctly held that negligence is not the standard to be applied, there are many other considerations that go into the determination of delictual liability between holders of coexisting rights to the same immovable property, such as the temporal order of the leases or other rights, the nature of the rights, the type of activities normally incidental to the use for which the rights were granted, the damage-causing party's knowledge of the existence of the damaged party's rights, the availability of alternative methods of exercising the right so as to cause little or no damage, and others. Of course, the existence of these considerations and the importance thereof will vary from case to case.
We therefore clarify the Butler decision to hold that, in cases involving damages caused to one holder of a right to immovable property by another holder of a right to the same property, the court in determining "fault" under Article 2315 must consider not only Articles 667-669, but also all other applicable codal and statutory rules and legal principles and other pertinent considerations.

Application of Principles to the Present Case
The only property in which plaintiff and Exxon held coexisting rights was the property covered by Exxon's right-of-way and surface lease, an area of 8.2 acres. Insofar as this record shows, Exxon held no other rights to the remainder of the property covered by plaintiff's oyster lease. This case therefore differs from Butler in that no mineral rights are involved and the Mineral *1253 Code does not apply by analogy in the determination of fault.[9] Nevertheless, as to these 8.2 acres, plaintiff and Exxon were holders of coexisting property rights to the same property, and the liability of one for damage to the other depends on proof of more than just causation and damages.
The owner of an immovable possesses a "bundle of rights"[10] that constitutes property. When a landowner grants the right for a specific, non-exclusive use of the property to another through a lease, servitude or other instrument, the landowner retains the right to continue any other use of the property that does not interfere with the right granted. Moreover, the owner can transfer this retained right of use to a third party. And when the owner has granted limited, nonexclusive rights to two parties to use the same property for different purposes, the two parties have correlative rights and obligations. As noted above, there are numerous considerations in the determination of delictual liability between the holders of coexisting rights to the same immovable property.
In the present case, Exxon acquired the right from the State to dredge, maintain and use the canal on the right-of-way and to install and operate the tank battery on the surface lease. Exxon began exercising these rights in 1972. When plaintiff acquired his oyster lease ten years later, the canal had been dredged and was being used, and the tank battery had been constructed and was operating. The nature of Exxon's existing use incidental to its surface lease and right-of-way precluded oyster production on the same property and made these 8.2 acres unavailable for plaintiff's use under his lease.[11] Moreover, Exxon's maintenance dredging in 1983 did nothing to cause further damage to plaintiff's right to use the 8.2 acres for growing oysters, because that right was already nil. The State (if it had not granted plaintiff's oyster lease) would have had no right to use the 8.2 acres in a manner inconsistent with Exxon's use, and plaintiff did not acquire under the oyster lease any rights greater than those of the landowner.
We accordingly conclude that Exxon is not liable for any damages to plaintiff in their relationship as holders of coexisting rights to the 8.2 acres.
A somewhat different analysis is applicable to Exxon's liability in its relationship with plaintiff as neighboring proprietors, and a different result obtains. While a sophisticated balancing of many considerations is required to determine delictual liability in the case of two holders of coexisting rights to the same property, the principles of Articles 667-669 are the primary considerations in the determination of delictual liability in the case of adjoining proprietors.
Under Articles 667-669, Exxon was prohibited from performing any actions on its surface lease and right-of-way which would cause damage to plaintiff on the adjoining property or interfere substantially with plaintiff's enjoyment of the property, and plaintiff was required to tolerate some inconvenience from Exxon's normal use of its property rights.
The 1983 dredging caused damage to property which was within plaintiff's oyster lease but outside of Exxon's servitude and surface lease. The damaged property consisted of the 4.28 acres dredged by Exxon to the west of the right-of-way, the 5.13 acres east of the right-of-way on which Exxon deposited dredged materials and created a spoil bank, and the 13.84 acres of slumped spoil spread area and prop wash area. These twenty-three *1254 and one-fourth acres, along with the three acres dredged in the right-of-way on the eastern section of the canal, constituted the twenty-six and one-fourth acres that the trial court found in need of restoration.
Exxon clearly had no right to dredge the 4.28 acres west of and outside the right-of-way, and is liable for any damages sustained by plaintiff because of this dredging.
As to the spoil bank area and slumped spoil spread area, the right-of-way agreement granted Exxon the right to dredge and maintain a canal within the servitude, but the agreement was silent as to any right to spread dredged materials or to establish a spoil bank outside the servitude. We must therefore decide whether Exxon's depositing of spoil outside the servitude, on property owned by the State and leased to plaintiff for oyster growing, violated its responsibility to its neighbors.
The 1972 right-of-way agreement only gave Exxon the right to "deposit spoil on banks." Exxon did not obtain any express authority from the State to establish a spoil bank or even to spread the spoil in the bay. Moreover, even if the right-of-way agreement from the common grantor (the State) can be interpreted as having given Exxon the implied right to deposit spoil in the bay rather than having to move it onto shore, there were apparent alternative methods of exercising the right which would have caused significantly less damage.
According to the evidence, viewed in the light most favorable to the party who prevailed in the trial court, plaintiff's lease boundaries were staked with numerous willow poles and "Oyster Lease" signs before the 1983 dredging, and the stakes remained in place after the dredging except in the area where the dredging occurred. Therefore, Exxon knew or should have known the location of plaintiff's oyster grounds. Exxon could have contacted plaintiff and determined the location of the oyster plantings which were confined to sixteen acres near the south shore as shown on the following exhibit:[12]

*1255 With knowledge of the location of the seed oysters, Exxon could have spread the spoil in the bay far enough away from the oyster plantings to avoid most of the damage which occurred from establishing a spoil bank on top of seed oysters and from silting. Moreover, spreading the spoil in the manner required by the Corps of Engineers' permit apparently would not have destroyed the marsh mat.
We therefore conclude that Exxon's use of the property in its servitude area in such a manner as to injure its adjoining neighbor constituted fault under Article 2315 by analogy to Articles 667-669, and that Exxon's use occasioned more than mere inconvenience to the neighbor. Exxon is therefore liable without negligence for any damages sustained by plaintiff because of the manner of disposition of the dredged materials and the slumping of the spoil from the bank.

Damages
In this court Exxon contested its liability for plaintiff's loss of seed oysters and for loss of anticipated income from oyster production, but did not challenge the amounts of the awards for these items of damages.
The most significant item of damages awarded by the trial court was the cost of restoring the water bottoms to their original condition by removing the spoil bank and by reconstructing the marsh mat with a six-inch mat of shells over the entire damaged area of more than twenty-six acres. Exxon contends primarily that the right to recover restoration costs of the water bottoms belongs to the owner, the State, and that plaintiff has no right of action to such recovery. Exxon further argues that the record does not establish the condition of the water bottoms before 1983, except for a 1971 survey by the Department of Wildlife and Fisheries which reported that the northern end of Bay Lanaux was silty, soft and muddy.[13] Accordingly, Exxon contends that "restoring" unproved oyster grounds to perfect oyster growing conditions is more initial construction than restoration of oyster grounds.
Plaintiff bases his right of action on La. Rev.Stat. 56:423 B(1) which provides that a "lessee of oyster beds or grounds ... shall have the right to maintain an action for damages against any person ... causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee."
La.Rev.Stat. 56:423 B(1) recognizes an oyster lessee's right to recover his own damages for injury to his oyster beds. The awards for loss of seed oysters and loss of income from anticipated production were based on this right of recovery. However, the statute cannot reasonably be construed to authorize recovery of damages sustained by another party. The critical question, therefore, is whether plaintiff has a real and actual interest in recovering restoration costs in this particular case.[14]
The property damage to be restored (or rebuilt) in this case was the destruction of the marsh mat which provided the foundation for the seed oysters. However, plaintiff simply placed the seed oysters on the water bottoms; he did not construct the marsh mat on which the oysters were planted or build a shell reef for the planting. Plaintiff took the bottoms, with the existing marsh mat, as he found them in the condition that existed at the time of the original lease. Therefore, the party with the real and actual interest in restoring or rebuilding the damage caused by the dredging in this case was the owner rather than the oyster lessee.[15]
*1256 Plaintiff relies on Roman Catholic Church v. Louisiana Gas Serv. Co., 618 So.2d 874 (La.1993) in support of his claim for restoration costs. The Roman Catholic Church case involved a claim by the owner (not the lessee) of damaged property to recover the full cost of restoration, although the cost of restoration exceeded the fair market value of the property. This court stated:
[A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Id. at 879-80.
Here, any real and actual interest in restoring the property was in the owner and not the lessee who had little or no "personal" reason for restoring the property to its original condition.
This is not to say that Exxon's dredging did not cause plaintiff damages to his leasehold interest, in addition to the loss of seed oysters and loss of anticipated income from production from those oysters. The value of plaintiff's leasehold interest may have been reduced by destruction of or damage to the water bottoms, and plaintiff has a real and actual interest in that recovery. However, that item of damages is measured in this case by the value of the leasehold interest before and after the dredging, and not by the cost of totally rebuilding the water bottoms to their former condition.
The record does not contain any evidence of the value of plaintiff's leasehold interest before and after the dredging, which is the proper measure of this item of damages. Because the parties may have been misled in this regard by previous intermediate court decisions, it is appropriate to remand the case to the district court for further evidence and for a decision on this issue. On remand, the court should consider not only the rental price of the lease, but also the money, time and effort expended by the lessee in developing the lease, the availability of comparable leases, and other relevant factors.

Decree
The judgments of the lower courts are affirmed in part as to the award of damages for loss of seed oysters and for loss of anticipated income from oyster production. The remainder of the judgments is set aside, and the case is remanded to the district court for further proceedings in accordance with this opinion.
KIMBALL, J., dissents in part.
KIMBALL, Justice, dissenting in part.
This case presents two principal issues: (1) the correlative rights and obligations of these two parties, as holders of rights on neighboring properties, and (2) the right of an oyster lessee to recover the cost of restoring the leased water bottoms that were damaged by the dredging operations. I write separately because although I subscribe to the majority's opinion on the former, I disagree with the analysis supporting the majority's decision on the second issue.
I would affirm the lower court's award of damages for the cost of restoring the water bottoms to their original condition by removing the spoil bank and by reconstructing the marsh mat with a six inch mat of shells over the entire damaged area because I believe that LSA-R.S. 56:423(B)(1) provides Mr. Inabnet with a right to recover those damages in this case.
It is well settled that when the language of a law is susceptible of different meanings, as in this case, it must be interpreted as having the meaning that best conforms to the purpose *1257 of the law,[1] and laws on the same subject matter must be interpreted in reference to each other.[2] Therefore, LSA-R.S. 56:422 must not be interpreted in a vacuum, rather, it must be considered in light of the entire legislative scheme to which it belongs.
LSA-R.S. 56:422 et seq., which is found in Subpart D of Part VII of the General Provisions For Wildlife and Fisheries, governs both oysters and the oyster industry in Louisiana. A close reading of this statutory scheme reveals that oyster leases on state-owned water bottoms[3] are not the ordinary leases contemplated in Title IX of Book III of the Civil Code. Rather, these oyster leases are an instrument used by the State of Louisiana to foster and protect the Louisiana oyster industry. Subpart D regulates the residency of persons engaging in the oyster industry;[4] prohibits all but certain enumerated persons from taking or selling oysters;[5] mandates specific water bottom oyster lease provisions and conditions;[6] and regulates the application, commencement, duration, renewal, and filing of oyster leases[7]. Moreover, LSA-R.S. 56:430 also distinguishes the oyster lessee from ordinary lessees by obliging the oyster lessee to cultivate a certain percentage of the leased water bottoms, to stake off and mark the leased water bottoms before harvesting, and to mark off seeded areas to prevent seining or trawling by others.
While all the provisions in LSA-R.S. 56:422 et seq. demonstrate the legislature's desire to create a special set of rules for water bottoms leased for oyster purposes, LSA-R.S. 56:423 is the clearest example of that intent. LSA-R.S. 56:423(B)(1) provides:
A lessee of oyster beds or grounds who has obtained, recorded, and marked his lease in compliance with the law shall have the right to maintain an action for damages against any person, partnership, corporation, or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee. (emphasis added)
The language in this special statute which gives a right of action for damages to an oyster lessee is a stark contrast to the general lease provisions in the Civil Code. For example, LSA-C.C. article 2697 provides:
If, during the lease, the thing be totally destroyed by an unforseen [unforeseen] event, or it be taken for a purpose of public utility, the lease is at an end. If it be destroyed in part, the lessee may either demand a diminution of the price, or a revocation of the lease. In neither case has he any claim for damages. (emphasis added)
Similarly, LSA-C.C. Article 2699 provides:
If, without any fault of the lessor, the thing cease to be fit for the purpose for which it was leased, or if the use be much impeded, as if a neighbor, by raising his walls shall intercept the light of a house leased, the lessee may, according to circumstances, obtain the annulment of the lease, but has no claim for indemnity.

Inasmuch as the general lease provisions of the Civil Code do not provide the level of protection to ordinary lessees that LSA-R.S. 56:423 provides for oyster lessees, it is clear that the legislature intended to create special rights for these lessees.
Exxon argues that awarding oyster damages to an oyster lessee is inconsistent with Louisiana's oyster statute which allows oyster lessees to recover for "oyster ground" damage and not "water bottom" damage. I believe that this contention is without merit. The words of a law must be given their generally prevailing meaning.[8] A generally prevailing meaning of the word "ground" is "the bottom of the sea or a body of water." Webster's Third New International Dictionary (1966). The legislature gave oyster *1258 lessees the right to collect damages, not only for oyster beds, but for oyster grounds as well. The legislature could have easily limited the oyster lessee's recoverable damages to lost income, but the legislature elected not to do that. This right was granted to the oyster lessee to protect the lessee's investment in developing water bottoms for oyster production.
While this court has not previously addressed the specific issue of restoration of water bottoms, restoration damages have long been recognized in Louisiana jurisprudence as an appropriate item of recovery. Skansi v. Signal Petroleum[9] is the genesis of restoration as a recognized item of damage in Louisiana. In Skansi, which involved a suit by an oyster lessee to recover damages to his leased oyster beds caused by petroleum pollution in the area, the court, noted:
The leased property in Bayou Grand Cheniere, which was a profit producing asset, was temporarily damaged by defendants' torts, and plaintiff's damages should be measured by the cost of restoring the property and the value of the loss of the property during the period of repair. (emphasis added)
See also: Tesvich v. 3-A's Towing Co., 547 So.2d 1106 (La.App. 4th Cir.1989) writs denied 552 So.2d 383, 384 (La.1989) and Sercovich v. Chevron U.S.A., Inc., 626 So.2d 434 (La.App. 4th Cir.1993).[10]
The majority is also concerned about the possibility of a situation where an oyster lessee might be allowed to recover damages for injury to leased water bottoms but who might not be obliged to restore the water bottoms and might subsequently use the recovered sum for another purpose, leaving the owner (the state) without the opportunity to accomplish the restoration. However, LSA-R.S. 56:428(A) requires that all leases made under Subpart D shall continue for fifteen years, and under certain conditions, the lease is automatically renewed. R.S. 56:430 requires the lessee to keep a certain percentage of the leased water bottoms under cultivation. These provisions make it clear, to me, that the oyster lessee has the ultimate interest in restoring the water bottom. The legislature, aware of this interest, chose these leases as a means of achieving the policy goal of protecting and preserving a natural resource, Louisiana's water bottoms.
For the foregoing reasons, I must concur with the majority's holding on the issue of the correlative rights of these parties, but I must respectfully disagree with the majority's analysis on the issue of restoration damages.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Calogero, C.J. was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] The lease was actually granted to Exxon's predecessor, but the name Exxon will be used throughout this opinion for simplicity.
[2] The right-of-way agreements did not expressly grant or deny Exxon the right to deposit dredged soil outside the boundaries of the right-of-way.
[3] The eastern section of the right-of-way continued north of Bay Lanaux, apparently across the property of other owners, to a well location in the marsh. The western section of the right-of-way continued west of Bay Lanaux across the marsh to Grand Bayou.
[4] Exxon apparently did not introduce the 1972 permit application and drawing for the eastern section of the canal. Exxon did attach to its brief in this court a copy of its initial permit application and drawing for the eastern section, showing that the spoil for the eastern section of the canal was to be deposited in the bay, with marked navigation breaks every 1,000 feet. This drawing is inconsistent with other permits in the record, including the permit for the 1978 dredging which required the spoil to be spread.
[5] Apparently Exxon already held an oil, gas and mineral lease in the Bay Lanaux area, but the location of that lease is not shown in the record.
[6] The 13.8 acre slumped soil area included 2.8 acres which were also disturbed by vessel traffic servicing Exxon's tank battery facilities through the break in the spoil bank.
[7] The court found that 3,560 sacks of seed oysters, with a value of $6.00 per sack, had been destroyed.
[8] The court found that plaintiff lost income for four years of anticipated production from the oysters planted by him and calculated this loss by multiplying the estimated sales price by the number of sacks anticipated to be produced each year, reduced by production costs and by the percentage of the undamaged portion of the crop that remained productive.
[9] Butler also differs in that Butler involved a right-of-way purchased by the mineral lessee from the plaintiff oyster lessee whose lease predated the mineral lease.
[10] Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979); Louisiana Power and Light Co. v. Gaupp, 255 La. 563, 570, 232 So.2d 273, 275 (1970).
[11] The situation in this case, as to these 8.2 acres, is therefore vastly different than if Exxon had caused damage while exercising rights under a mineral lease that encompassed the same eighty-four acres included in plaintiff's oyster lease. When neither of the holders of coexisting mineral leases and oyster leases uses the entirety of the overall area and a use by one on part of the property causes damage to the other, the determination of the delictual liability involves many more complex considerations.
[12] The exhibit was prepared by Exxon's expert marine biologist from information received from plaintiff's employee who assisted in planting the seed oysters. There was no drawing introduced into evidence which correlated the areas of dredging damage with the area of oyster planting.
[13] Plaintiff's employee who assisted in the planting testified that much of the remainder of Bay Lanaux had soft bottoms.
[14] La.Code Civ.Proc. art. 681 requires the plaintiff to have a right of action, defined as a "real and actual interest" in the action brought by him. One primary purpose of the requirement that the plaintiff before the court have a right of action is to prevent the defendant from being liable for the entire amount of the claim to multiple parties.
[15] The owner of water bottoms is normally the party with the right of action to recover the costs of restoration. In some situations, as in a long-term lease in which the lessee has made significant improvements, the lessee may have a greater interest than the owner in restoring damaged property. The present case, however, does not present such a situation. Moreover, if the oyster lessee were allowed to recover damages for injury to the water bottoms, the lessee would not be obliged to restore the water bottoms and could use the money as he pleases, leaving the owner (the State) without even the opportunity to accomplish the restoration.
[1] LSA-C.C. Art. 10.
[2] LSA-C.C. Art. 13.
[3] See LSA-R.S. 41:1225.
[4] LSA-R.S. 56:422.
[5] LSA-C.C. Art. 56:424.
[6] LSA-R.S. 56:425.
[7] LSA-R.S. 56:426-29.
[8] LSA-C.C. Art. 11.
[9] 375 So.2d 965 (La.App. 4th Cir.1979).
[10] It should be noted, however, that the court in Sercovich relied extensively on the lower court decision in this matter, Inabnet v. Exxon Corporation, 614 So.2d 336 (La.App. 4th Cir.1993).