| MARTY MELERINE AND OYSTER FISHERIES, INC. | * | NO. 2019-CA-0672 |
|---|---|---|
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| TOM'S MARINE & SALVAGE, LLC, TOM'S WELDING, INC., TRIPLE T MARINE, LLC, CAPTAIN JAMES WILLIAMS, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, AND ALLIANZ GLOBAL CORPORATE AND SPECIALTY SE | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| | * * * * * * * | |

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 17-0472, DIVISION "B"
Honorable Jeanne Nunez Juneau, Judge Presiding
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Chief Judge James F. McKay, III, Judge Daniel L. Dysart, Judge Dale N. Atkins)


Stephen Skelly Kreller
Katie M. Cusimano
THE KRELLER LAW FIRM
757 St. Charles Avenue, Suite 301
New Orleans, LA 70130

Jonathan W. Dettmann (admitted *pro hac vice*)
Craig S. Coleman (admitted *pro hac vice*)
Evelyn D. Snyder (admitted *pro hac vice*)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402


       COUNSEL FOR PLAINTIFF/APPELLEE

Andrew C. Wilson
MILLING BENSON WOODWARD, L.L.P.
68031 Capital Trace Row
Mandeville, LA 70471

Frederick W. Swaim, III
Galloway, Johnson, Tompkins, Burr & Smith, APLC
701 Poydras Street, Suite 4000
New Orleans, LA 70139

COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**
**MARCH 4, 2020**

This is a tort case involving a tugboat grounding on an oyster lease in St. Bernard Parish. Appellants, Tom's Marine & Salvage, LLC ("TMS"), and its primary liability insurer, AGCS Marine Insurance Company ("AGCS") appeal the jury verdict awarding Appellees, Marty Melerine and Oyster Fisheries, Inc. ("OFI"), damages in the total amount of $6,087,701.47. For the reasons that follow, we affirm.

## BACKGROUND

Marty Melerine ("Mr. Melerine"), an oyster farmer for over thirty years, owns a 140-acre oyster lease in Christmas Camp Lake in St. Bernard Parish, Louisiana, under lease number 34005-09. Van Robin, ("Mr. Robin"), an oyster farmer for over forty years, subleases lease number 34005-09 from Mr. Melerine through his company, OFI. Both leases are located in Christmas Lake, St. Bernard Parish, Louisiana. Mr. Melerine and Mr. Robin developed the leases over several years to increase the productivity of the leases. Mr. Melerine and Mr. Robin both testified these were their most productive leases.

On April 7, 2016, Tom Dinh ("Mr. Dinh"), the owner of Tom's Marine & Salvage, LLC ("TMS"), sent a tugboat, the M/V *Miss Elsie D* (the "tugboat"), from

Lafitte, Louisiana to Lake Pontchartrain to rescue another TMS vessel that sunk. That vessel, the "Sunshine," had sunk in Bayou Lacombe, on April 6, 2016, along the northshore of Lake Pontchartrain and was in peril of capsizing which would have caused a diesel oil spill and resulting Coast Guard sanctions. Time was critical, so Mr. Dinh prepared the M/V *Miss Elsie D* for the salvage mission, which involved attaching a 135-foot long, 40-foot wide crane barge to the tugboat—a 65-foot, three-story tug with twin 60-inch propellers. James Williams ("Captain Williams") was hired by Mr. Dinh to captain the tugboat.

The fastest and shortest route would have been through the Algiers Lock, across the Mississippi River, through the Industrial Canal Lock into Lake Pontchartrain. However, the Algiers Lock was under repair, and when Captain Williams spoke to the Algiers Lockmaster, he advised the Algiers Lock would be closed for two to three days. After a discussion with Mr. Dinh, the decision was made to take a longer route, south through Barataria Bay through the Empire Locks, down the Mississippi River, across Breton South, through the Mississippi Sound, across Lake Borgne and into Lake Pontchartrain.

After entering Breton Sound and encountering a storm, the tugboat lost its Global Positioning System ("GPS"). Captain Williams continued without GPS or charts and entered the mouth of the Mississippi River-Gulf Outlet Canal ("MRGO"), at which point the tugboat lost its clutch, resulting in the loss of an engine and rudder power. Captain Williams contacted Mr. Dinh who advised to bring the vessel to Hopedale, Louisiana ("Hopedale"), in order to repair the clutch and GPS. The MRGO is blocked between the mouth and Hopedale, so Captain Williams decided on a route through Bay Eloi and ultimately across Christmas

Camp Lake where the tugboat grounded over the boundary of OFI's and Mr. Melerine's leases.

Several people tried to aid Captain Williams in maneuvering the tugboat off the leases. Lonnie Assavedo ("Mr. Assavedo"), an oysterman working in Christmas Camp Lake, testified that he saw Captain Williams enter the lake on the date of the grounding and that he instructed Captain Williams to turn around out of caution for the oyster leases in the area because the water in the lake was too shallow to support the tugboat. Mr. Assavedo testified that Captain Williams turned the tugboat around and onto Mr. Melerine's oyster lease, where the tugboat grounded. Captain Williams testified that he called Mr. Dinh for assistance and was instructed to move off of the oyster leases. In response to Mr. Dinh's instructions, Captain Williams testified that he "revved the engine" to move the tugboat, which just caused the tugboat to rock back and forth. Mr. Melerine testified that he also came to assist Captain Williams in moving the tugboat off of the lease, and that, as Captain Williams attempted to move the tugboat, it just moved back and forth, stirring up sediment with the propellers. Captain Williams remained grounded in the area until the next morning, April 10, 2016.

On April 5, 2017, Appellees filed suit against TMS, Tom's Welding, Inc., Triple T. Marine, Captain Williams and TMS' alleged primary liability insurer, Allianz Global Corporate and Specialty SE and Allianz Global Risks US Insurance Company, Inc., alleging extensive damage to their oyster leases as a result of the grounding. On June 27, 2017, Appellees amended their petition to name AGCS Marine Insurance Company as a defendant and moved to dismiss Allianz Global Risks US Insurance Company and Allianz Global Corporate and Specialty SE as defendants with prejudice, which the trial court granted.

3

Thereafter, on December 18, 2018, Appellees filed a motion to dismiss Captain Williams and Tom's Welding, Inc. as defendants with prejudice. On December 19, 2018, the trial court dismissed Captain Williams and Tom's Welding, Inc. with prejudice, but ordered that Captain Williams make himself available to testify at trial, if called.

Prior to trial, Appellants and Appellees entered the following joint stipulations:

> (1)    The "Incident" refers to the grounding of the *Miss Elsie D* on Marty Melerine's lease on April 9-10, 2016. "Trip" refers to the voyage of the *Miss Elsie D* from the time it left Tom's Marine & Salvage, LLC's ("TMS") dock on April 8 until it exited Mr. Melerine's lease on April 10, 2016.

> (2)    Captain Williams was acting within the course and scope of his employment by TMS throughout the Trip and the Incident.

> (3)    Captain Williams was subject to the direction of TMS, and acted on its behalf and for its benefit, throughout the Trip and Incident.

> (4)    Discovery has yielded no evidence that Tom's Welding, Inc. had any involvement with or responsibility for the Trip and the Incident.

> (5)    Discovery has yielded no evidence that the *Miss Elsie D* was unseaworthy at the time that TMS chartered the vessel from Triple T Marine, LLC ("Triple T") subject to a bareboat charter agreement.

Additionally, Appellants and Appellees stipulated that the AGCS policy has a limit of $1 million; that this policy is the only policy at issue in this matter; and that this policy "excludes coverage of punitive damages."

On January 18, 2019, an eight-day jury trial on the merits commenced. Appellees presented several fact and expert witnesses at trial, including Mr.

4

Melerine, Mr. Robin, Mr. Assavedo, Dr. Edwin Cake ("Dr. Cake"), Scott Porter ("Mr. Porter"), Ralph Litolff ("Mr. Litolff"), and a rebuttal witness, Dr. George Flowers ("Dr. Flowers"). Appellants also presented several expert witnesses.

On January 24, 2019, the jury rendered its verdict, finding TMS was negligent and caused damage to Appellees' oyster leases. The jury awarded compensatory damages to Mr. Melerine in the amount of $4,937,532.77 and awarded $1,150,169.70 to OFI. The trial court issued a written Judgment on the Jury Verdict on January 30, 2019. Thereafter, on February 1, 2019, AGCS filed a Motion to Vacate Judgment, arguing the trial court's January 30, 2019 judgment: (1) was inconsistent with the jury verdict form which does not list AGCS as a defendant.; (2) did not limit the damage award consistent with the terms and conditions of AGCS's policy and the parties' stipulation as to the policy limit; and (3) was prepared by Appellees' counsel without being circulated for approval by all parties, in violation Louisiana District Court Rule 9.5. On February 8, 2019, TMS filed a Motion for New Trial arguing that the trial court violated La. C.E. art. 411 by allowing Appellees to present the limits of its policy limits at trial. The trial court heard the Motion to Vacate Judgment and the Motion for New Trial on March 21, 2019. Following the hearing, the trial court rendered an amended judgment on April 10, 2019, consistent with the jury's verdict, awarding compensatory damages to Mr. Melerine in the amount of $4,937,532.77 and OFI in the amount of $1,150,169.70 and providing that AGCS's liability extends to, but does not exceed, the policy limits of AGCS's insurance policy. On April 11, 2019, the trial court denied TMS's Motion for New Trial. Appellants now appeal.

## STANDARD OF REVIEW

"In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *White v. Cox Operating, LLC*, 2016-0901, p. 4 (La. App. 4 Cir. 4/5/17), 229 So.3d 534, 538 (quoting *Hall v. Folger Coffee Co.*, 2003-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98). "Thus, a reviewing court may not merely decide if it would have found the facts of the case differently." *Id.*

"In order to reverse findings of the factfinder, 'an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong.'" *Id.* (quoting *Harold A. Asher, CPA, LLC v. Haik*, 2012-0771, p. 4 (La. App. 4 Cir. 4/10/13), 116 So.3d 720, 723-24). "[A]n appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *Harold A. Asher, CPA, LLC*, 2012-0771, p. 4, 116 So.3d at 723 (quoting *Sassone v. Doe*, 2011-1821, p. 3 (La. App. 4 Cir. 5/23/21), 96 So.3d at 1245).

## DISCUSSION

On appeal, TMS and AGCS assign six assignments of error: (1) that the trial court erred in awarding restoration damages and loss of production damages; (2) that the trial court erred in its use of the Oyster Lease Damage Evaluation Board ("OLDEB") formulas in the calculation of damages and in disallowing Appellants'

evidence refuting the applicability of OLDEB; (3) that the trial court erred in not excluding Appellees' experts Dr. Cake, Mr. Litolff, Mr. Porter, and Dr. Flowers; (4) that the trial court erred in finding the plaintiffs had proven causation; (5) that the trial court erred in allowing presentation of TMS' available insurance policy limits; and (6) that the trial court erred in not granting an exception of no right of action as to OFI's claims due to an expired oyster sublease.

Because many of Appellants' assignments of error turn on the propriety of the application of the OLDEB formulas, we address the use of the OLDEB formulas first.

## I.  OLDEB

Appellants assert on appeal, as they did pre-trial, that the trial court's use of formulas promulgated by the OLDEB was in error in this case. In deciding the proper applicability of OLDEB, an overview of the legislative and jurisprudential framework of the OLDEB and its formulas is appropriate.

Recognizing the need to quell the uncertainty and unpredictability that accompanied adjudicating the increasing amounts of claims between oyster lease holders and entities in the oil and gas industry which caused an undue burden on the industry, in 1995, the legislature enacted La. R.S. 56:700.10 *et seq.*, creating the OLDEB. The purpose of the OLDEB is "to effect an equitable solution to the problem which will result in fair and predictable treatment to the oil and gas industry while assuring the oyster fishermen actual compensation for damages to their oyster beds due to mineral activities." La. R.S. 56:700.10. In enacting La. R.S. 56:700.10 and establishing the OLDEB, the legislature noted that the state "has a tremendous interest in preserving the viability of both [the oyster and oil and gas] industries." The OLDEB was then directed to "promulgate rules and

7

regulations to determine the method of establishing a uniform system of compensation for actual damages caused to the beds of leaseholders based on biological test data." *Id.*

As mandated by the statute, the OLDEB promulgated rules and regulations, or "formulas," to be used in calculating and awarding actual damages caused to the beds of oyster leaseholders based on biological test data. Specifically, the OLDEB calculates damage awards due to an oyster leaseholder for damages to their oyster lease based on two components: (1) standing stock loss damages, which are the lost revenue from oysters damaged that can no longer be sold at market price; and (2) the "currency cultch matrix," which calculates the costs associated with rebuilding and restoring the oyster bed by investing in and planting new cultch material. *See Avenal v. State, Dep't of Nat. Res.*, 2001-0843, pp. 1-61 (La. App. 4 Cir. 10/15/03), 858 So.2d 697, 723, (Tobias, J., dissenting), *rev'd sub nom Avenal v. State*, 2003-3521 (La. 10/19/04), 886 So.2d 1085. These formulas and procedures are the exclusive method by which damages are measured for claims related to damages caused by oil and gas companies. They are also regarded as the predominant method of determining damages to oyster leases outside of claims involving the oil and gas industry.

Appellants argue that the OLDEB formulas are not applicable here and the trial court erred in allowing evidence to be presented on the OLDEB formulas to the trier of fact for the determination of damages. Appellants argue that this case is not an oil and gas case, and therefore, the OLDEB formulas do not apply. They further argue the trial court erred in refusing to allow them to introduce evidence in the form of minutes from a 1999 OLDEB meeting to show that the OLDEB formulas are not meant to be used outside of oil and gas cases. Appellants argue

that, instead of allowing the OLDEB formulas to be submitted to the jury for the purpose of calculating damages, the only proper calculation of damages in this case is to award the difference between the current value of the lease and the value of the lease before the grounding.

To support their argument that the OLDEB formulas are inapplicable outside of oil and gas cases, Appellants assert, on appeal, that "there is not a single decision from any court in Louisiana, or for that matter, the entire country, which has gone to final judgment allowing the use of the OLDEB compensation formulas outside of an OLDEB case." Contrary to that statement, however, Appellants point this court's decision in *Avenal*, 2001-0843 (La. App. 4 Cir. 10/15/03), 858 So.2d at 709-743. Appellants argue that Judge Tobias's dissent in *Avenal* supports their argument that the OLDEB formulas are not applicable here or in any case outside cases involving the oil and gas industry. According to Appellants, Judge Tobias detailed in his dissent the origin of the OLDEB formulas, and discussed their shortcomings in calculating damages based on the replacement of cultch to repair oyster lease reef, also known as the "currency cultch matrix." Appellants then cite the Louisiana Supreme Court's reversal of this Court's decision in *Avenal v. State*, 2003-3521, p. 11 (La. 10/19/04), 886 So.2d 1085, 1093-94, specifically noting the Court's skepticism in the award of damages based on the "currency cultch matrix." We find the Appellants' reliance on both *Avenal* decisions to be misplaced.

As in this case, *Avenal* involved the use of OLDEB outside of the oil and gas industry, with oyster lessee plaintiffs bringing a class action lawsuit for damages caused by freshwater intrusion from the Caernarvon Freshwater Diversion Project. The plaintiffs in *Avenal* claimed the Caernarvon Freshwater Diversion Project changed the salinity levels of their oyster leases, damaging their oyster harvest.

9

The trial court allowed the OLDEB formulas to be used in calculating the plaintiffs' damages. While the Supreme Court reversed this Court's affirmation of the trial court judgment, it did so by finding—as did Judge Tobias—that the plaintiffs' claims were prescribed. The Louisiana Supreme Court did not expressly hold, and, in his dissent, Judge Tobias did not observe that the OLDEB formulas could not be applied outside of cases involving claims against the oil and gas industry.

Like *Avenal*, this case is not an oil and gas case, as reflected by the record. Rather, this case involved a tugboat—which at no point has been alleged to have been acting as or on behalf of any oil or gas entity—that unintentionally grounded on Appellees' oyster leases, causing damages. This Court disagrees, however, with Appellants that the OLDEB formulas are only to be applied to cases involving claims by oyster lessees for damages caused by the oil and gas industry. La. R.S. 56:700.10 provides that the purpose of the OLDEB was to "promulgate rules and regulations to determine the method of establishing a uniform system of compensation for actual damages caused to the beds of leaseholders based on biological test data" without qualification of the type of entity that caused the damage. The purpose stated in La. R.S. 56:700.10 is not served by limiting oyster lease holders from recovering their actual damages to cases where the damages are caused by entities of the oil and gas industry. The purpose is also not served by awarding only the difference between the current value of the leases and the value of the leases before the grounding, as Appellants argue should have been done here.

Moreover, nothing in the statute prevents the OLDEB formulas from being used for claims by oyster lease holders in other types of claims, and we decline to

10

interpret it that way. "Where a statute is clear and unambiguous, the court must give credence to the mandate expressed by the Legislature and cannot resort to construing a statute based on the spirit of the law as opposed to the plain wording of the law." *Longman v. Allstate Ins. Co.*, 1993-0352, 635 So.2d 343, 349 (La. App. 4 Cir. 1994). *See also Daigrepont v. Louisiana State Racing Commission,* 1995-0539 (La. App. 4 Cir. 10/26/95), 663 So.2d 840, *writ denied,* 1995-2828 (La. 2/2/96), 666 So.2d 1085; *State, Department of Transportation and Development v. Walker,* 1995-0185 (La. 6/30/95), 658 So.2d 190. Accordingly, we hold that OLDEB can be applied to cases outside oil and gas matters, and the trial court did not err in allowing the formulas to be applied here.

Finally, we find that the trial court did not err in preventing Appellants from introducing the minutes from the 1999 OLDEB meeting to establish that the use of the OLDEB was not appropriate in this case. As the trial court found, the minutes constitute inadmissible hearsay, and Appellants point to no exception that makes them admissible. *See* La. C.E. art. 801.[1] Further, the record reflects that Appellants availed themselves of the opportunity to establish their defense that OLDEB is not applicable here through other means, such as cross-examination.

## II.    Award of Damages

Having decided that the OLDEB formulas could be applied to this case, we next turn to Appellants' assignment of error regarding the award of damages, which were calculated using the OLDEB formulas to establish damages for restoration costs using the "currency cultch matrix" and damages for standing

---

[1] La. C.E. Art. 801 provides, in pertinent part, that: "'[h]earsay'" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.

stock loss. Appellants again argue that the trial court committed manifest error in awarding damages for restoration costs and standing stock loss based upon what Appellants claim were artificial formulas, all despite the Appellees' income tax records and oyster production records, which Appellants assert belie the Appellees' claims for damages. Appellants argue that the damages award should have been limited to the difference between value of the lease before and after the grounding. Appellants further assert that the damages award here "shocks the conscience." We find this assignment of error lacks merit.

### *Restoration Damages*

Under the OLDEB formulas, damages to oyster lease beds are calculated two ways: (1) damages for restoration of the reef using the "currency cultch matrix;" and (2) damages for the standing stock loss of oysters that can no longer be sold in the open market. *See Avenal*, *supra.* Regarding the award of damages, Appellants argue first that the trial court erred in using the "currency cultch matrix" in calculating and awarding Appellees restoration damages for the cost of repaving their damaged oyster leases with cultch following the grounding to repair the damaged reef. In support of their argument, Appellants cite *Inabnet v. Exxon Corp.*, 1993-0681 (La. 9/6/94), 642 So.2d 1243, a decision reached before the legislature enacted La. R.S. 56:700.10 *et seq.* and created the OLDEB. *Inabnet* held that, where an oyster lessee brings a petition for damages caused by actions which harmed his leasehold interest and loss of oyster production, "damages [are] measured…by the value of the leasehold interest before and after the dredging, and not by the cost of totally rebuilding the water bottoms to their former condition." *Id*. at 1256.

Appellees counter that *Inabnet* cannot be relied upon to support Appellants' argument that restoration costs for damages to oyster beds is never appropriate. The Court in *Inabnet* noted that there may be an exception to the rule of not awarding restoration damages to an oyster leaseholder where "[i]n some situations, as in a long-term lease in which the lessee has made significant improvements, the lessee may have a greater interest than the owner in restoring damaged property." *Id*. at 1255, nt. 15. Appellees argue that this exception applies to them. We agree.

First, we note that *Inabnet* was decided before the legislature created the OLDEB and directed it to use biological test data to develop ways to measure "actual damages" to the beds of oyster leaseholders. The OLDEB went on to consult with oyster biologists and other specialists in the oyster lease industry— one of whom was Appellees' expert oyster biologist, Dr. Cake—to develop a means of calculating those actual damages, which includes the materials and labor necessary to repair a damaged oyster lease. Therefore, we find that *Inabnet* is not applicable here.

Even so, the record reflects that this case meets the exception to the award of restoration costs laid out in *Inabnet*. The record reflects that both Mr. Melerine and Mr. Robin, OFI's owner, have held the leases at issue here for over twenty years. Both Mr. Robin and Mr. Melerine testified that, when they first obtained the leases, they were not very productive. They further testified that they made significant improvements to the leases to make them productive. They also testified that, following the BP Oil Spill in 2010, they had to put in extra effort to make sure the leases remained productive, including working around the clock to plant more cultch on the leases. They each also testified—and their testimony was supported by the testimony of other oyster leaseholders who work near them in Christmas

13

Camp Lake—that they have consistently expended great effort and money to make improvements to the leases so that they would be productive. We find that the record reflects that Appellees fall into the exception laid out in *Inabnet* and are entitled to an award for restoration damages.

The record also supports the amount of the award itself. Dr. Cake explained the "currency cultch matrix" at trial, saying that it involves multiplying three elements: (1) the number of acres of buried reef; (2) the amount of cultch needed to cover the damaged reef; and (3) the cost of the cultch, including the cost to transport it to the bed and the labor to place it. As to the first element, Dr. Cake testified that he personally measured Mr. Melerine's and Mr. Robin's reefs. Dr. Cake found that Mr. Melerine had sustained 34.2 acres of buried productive reef from the grounding with an additional half acre where the tugboat dug a several-inch thick trench, while Mr. Robin had sustained 12.5 acres of buried reef in the grounding. Regarding the second element, Dr. Cake testified that it would take approximately three inches of cultch—as recommended by the OLDEB formula—to cover the acres of buried reef and that it would take nine inches of cultch to repair the trench on Mr. Melerine's lease. Regarding the third element, Dr. Cake testified that he estimated the cost of the materials, transportation, and labor of laying the cultch to be $69.32 per cubic yard. The record then reflects that, per the OLDEB formula, Dr. Cake multiplied all three components together to project that Mr. Melerine's restoration cost damages would total $997,314.77 and Mr. Robin's would total $349,199.50. The record, therefore, supports the award for restoration costs, and we find that the award was not manifestly erroneous.

### *Loss of Production Damages*

Further, while Appellants make no argument as to why an award for damages to standing stock loss is inappropriate here, we disagree with Appellants that Appellees are only entitled to damages for the loss in value of their leasehold interest and find that standing stock loss or loss of production damages were properly awarded. *Inabnet*, the case on which Appellants rely in support of their position that Appellees are only entitled to an award for the loss of the lease value, affirmed the award of damages for loss of seed oysters and for loss of anticipated income from oyster production, *i.e.* loss of production damages. *Id.* at 1256. We therefore hold that the jury did not err in awarding Appellees loss of production damages.

Dr. Cake testified that he engaged Mr. Porter to dive on the leases and collect samples of standing stocks at several locations on Appellees' leases. Dr. Cake then used those samples to quantify the approximate number of shell material on the leases to estimate the number of oysters that the leases were anticipated to produce in the future. Thereafter, Dr. Cake estimated the number of sacks that were lost per acre on the leases to determine the amount of lost profits.[2] The record reflects that the jury reduced the awards claimed by Appellees based on the percentages each of the Appellees would normally make, as the Appellants argued they should.

Further, the record reflects that more than one witness, including Dr. Cake, Mr. Melerine, and Mr. Robin, testified about the productivity of the leases and value of the amount of oysters that were lost because of the grounding. They noted

_____

[2] Dr. Cake stated this number included the amount the lease holders would make off of each sack of oysters, minus the cost to harvest them.

that Louisiana produces the most oysters in the world, with St. Bernard Parish, where Appellees' oyster leases are located, being the most productive parish in the state and the Christmas Camp Lake oyster leases being among the most productive in the parish. Mr. Melerine and Mr. Robin further testified that, while they held oyster leases elsewhere, the leases they held in Christmas Camp Lake that were damaged by the tugboat grounding were consistently their most productive and that they expended great effort and resources in making them that productive. The record supports the jury award of damages in this case.

### III. Admission of Expert Testimony of Dr. Cake, Mr. Litolff, Mr. Porter, and Dr. Flowers

Next, we address Appellants' third assignment of error regarding the trial court's admission of Appellees' experts Dr. Cake, Mr. Litolff, Mr. Porter, and Dr. Flowers. "A trial court's ruling on ... evidentiary issues will not be disturbed unless a clear abuse of discretion is shown." *Jones v. Peyton Place, Inc.*, 1995-0574, pp. 11-12 (La. App. 4 Cir. 5/22/96), 675 So.2d 754, 763; *See also Sanford v. City of New Orleans*, 2003-0883, p. 13 (La. App. 4 Cir. 1/21/04), 866 So.2d 882, 890; *Tadlock v. Taylor*, 2002-0712, p. 7 (La. App. 4 Cir. 9/24/03), 857 So.2d 20, 27.

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as adopted by the Louisiana Supreme Court in *State v. Foret*, 628 So.2d 1116, 1121 (La. 1993), is the standard for determining whether a witness is qualified to testify in a matter as an expert. "*Daubert* set forth some non-exclusive factors for courts to consider in making a determination as to whether an expert's testimony was relevant and reliable. Those factors include but are not limited to: (1) the testability of the technique or scientific theory; (2) whether the theory or technique has been subjected to peer review and publication;

16

(3) the known or potential rate of error; and (4) whether the technique had gained 'general acceptance.'" *Hooper v. Travelers Ins. Co*., 2010-1685, p. 4 (La. App. 4 Cir. 9/28/11), 74 So.3d 1202, 1204-05. A trial court's decision to admit or exclude testimony from a witness offered as an expert is reviewed under an abuse of discretion standard. *Id*. at 1205; *Cheairs v. State Dep't. of Transp. and Dev.*, 2003-0680, p. 6 (La. 12/3/03), 861 So.2d 536, 541.

Prior to trial, Appellants challenged the admission of the expert testimony of Dr. Cake, Mr. Litolff, Mr. Porter, and Dr. Flowers. Appellants argued that Dr. Cake's testimony was not admissible because it was unreliable, because he was not qualified to render an opinion on the movement of sediment along the water bottoms, and because his calculation of "restoration damages" Appellees were due was based on the OLDEB formulas not applicable to this case. Appellants argued that Mr. Litolff departed from accepted accounting principles in calculating Appellees' inventory loss damages because he did not consult Appellees' tax returns or oyster production records following the grounding. They further argued Mr. Porter's testimony should be excluded because it would be cumulative to that of other witnesses, and that Dr. Flowers' testimony should be disallowed because he was merely being used as a rebuttal witness to refute Appellants' expert testimony.

The trial court denied Appellants challenges to Appellees' witnesses on January 4, 2019, finding that their testimony met the *Daubert-Foret* standard.[3] The record reflects that Dr. Cake, Mr. Litolff, Mr. Porter, and Dr. Flowers were offered

---

[3] The trial court ruled that while Mr. Porter could testify, his testimony was limited to exclude testimony which may be repetitive of the testimony of other witnesses.

as experts at trial by Appellees. Appellants now re-urge their challenges to their expert testimony.

### *Dr. Cake*

Appellants raise several issues related to Dr. Cake's expert testimony. First, they argue that Dr. Cake, though tendered as an expert in oyster biology, rendered opinions outside his expertise on the movement and settlement of the sedimentation on Appellees' leases caused by the grounding. Second, they argue Dr. Cake rendered only "personal" opinions and not expert opinions on the death of the oysters on Appellees' leases, as demonstrated by Dr. Cake's pre-trial deposition testimony. Third, they argue Dr. Cake's theory of restoration damages determined by the use of three-inch or nine-inch cultch on the Appellees' lease was belied by the Appellees' own pre-trial deposition testimony. Finally, they argue that Dr. Cake used "modified" OLDEB formulas that have never been peer-reviewed, and his testimony was unreliable, as demonstrated by his testimony being criticized or stricken in previous cases. Therefore, Appellants argue, the trial court erred in admitting Dr. Cake's expert testimony at trial. We find these arguments are without merit, and address each of them in turn.

First, we find that Dr. Cake did not render opinions outside his area of expertise. Appellants stated that Dr. Cake was tendered only as an expert in oyster biology. However, the record reflects that he was also tendered as an expert in oyster lease damage assessment, after testifying that he was an OLDEB-certified biologist who has done oyster lease assessments for over twenty years, and who helped to develop the formulas used by the OLDEB. The record shows that Dr. Cake rendered an opinion on the mortality of the oysters on Appellees' leases and opined that the deaths were caused by sediment settlement, based on the oysters'

muddy and blackened appearance. As an expert oyster biologist, it is within Dr. Cake's expertise to opine on the cause of the oysters' death. The record does not reflect that Dr. Cake rendered opinions on the movement of the sedimentation, but rather, accepted as true Appellees' and other oystermen's accounts of the condition of the lease and the sediment in the water prior to the grounding. The record reflects that Dr. Cake's expertise in oyster biology and oyster lease damage assessment would allow him to render opinions on this issue.

Likewise, as to Appellants' second argument about Dr. Cake's personal opinions versus expert opinions, we find this argument unpersuasive. To illustrate this point, Appellants point only to a portion of pre-trial deposition testimony—which was not admitted at trial—and the portion cited again shows Dr. Cake opining on the death of the oysters on Appellees' leases. As an expert oyster biologist with extensive experience in the field, we find this opinion to be within his expertise and, indeed, an expert opinion.

Appellants' third argument regarding Dr. Cake's estimation of cultch needed to restore Appellees' reef is also meritless. Though they contend Dr. Cake's testimony is at odds with Appellees' own testimony, Appellants again only point to pre-trial deposition testimony that was not admitted at trial. Appellants also mischaracterize the testimony of Appellees' witnesses adduced at trial. Mr. Robin stated that the cultch on the lease needed to rise at last a quarter to a half-inch above the sediment in order to be effective, and the number of inches of cultch necessary depended on the thickness of the sediment, which supports Dr. Cake's estimation of the amount of cultch necessary to restore the reefs.

Finally, we find that Dr. Cake's testimony assisted the trier of fact, and the trial court did not abuse its discretion in admitting it. Having already found that the

OLDEB formulas were properly applied in this case, allowing the testimony of Dr. Cake, who helped develop the OLDEB formulas for determining restoration costs as well as standing stock loss, helped instruct the trier of fact in making determinations on these points. Appellants make no citations as to how Dr. Cake improperly modified the formulas, and the record does not reflect that Dr. Cake modified them. Instead, the record reflects that Dr. Cake estimated the cost of cultch, sack prices for oysters, and harvesting costs—all numbers which are not stagnant and change over time—in using the formulas. We therefore find that the trial court did not abuse its discretion in admitting Dr. Cake as an expert.

### *Mr. Litolff*

Appellants contend that Mr. Litolff should have been excluded from testifying at trial as an expert certified public accountant and not allowed to give testimony on his computation of Appellees' standing stock loss as part of assessing damages. Appellants assert that Mr. Litolff should have been excluded because he "shunned business records and income tax returns in favor of abstract agricultural formulas" and that those formulas lacked professional support. We disagree.

The record reflects that, contrary to Appellants assertions on appeal, Mr. Litolff did consult Appellees' tax returns and oyster production records. Mr. Litolff testified, however, that using that information solely to compute Appellees' losses was not proper under the circumstances. Specifically, Mr. Litolff testified that while the tax returns showed that Appellees continued to harvest oysters after the grounding, they do not show from which leases or parts of the leases those oysters came, nor do they account for the lost oysters that could have been harvested but for the grounding. Instead, the record reflects that the standing stock loss computations Mr. Litolff performed were accepted as a form of computing loss

from inventory or property that was meant to be harvested and sold, as is the case here, and is properly awarded to oyster lessees. *See Inabnet*, 1993-0681, So.2d at 1256. Contrary to Appellants' assertions, the record reflects that Mr. Litolff cited to professional support for his formulas in calculating the standing stock loss and its use in this case both in his expert report and at trial. Indeed, Appellants themselves cite this support in their brief and make no showing that this authority is unreliable. Therefore, we find that the trial court did not abuse its discretion in admitting Mr. Litolff's testimony at trial.

### *Mr. Porter*

Appellants contend on appeal that Mr. Porter, who served as the diver who inspected Appellees' leases and took samples for Dr. Cake's evaluation, should not have been offered as an expert. Appellants argue that Mr. Porter, who has never before been qualified as expert, lacks any credentials to be properly considered an expert, that his testimony regarding the OLDEB procedures was improperly admitted because it was cumulative, the OLDEB formulas are inapplicable, and that he gave testimony Appellants imply was not credible. Having already held that OLDEB was properly applied to this case, we turn to the Appellants' other arguments as to Mr. Porter's admission as an expert, including his credentials and his alleged cumulative and incredible testimony. We find that these arguments lack merit and that the trial court did not abuse its discretion in allowing Mr. Porter's testimony.

The record does not support Appellants' contention that Mr. Porter lacks any credentials to serve as an expert. Mr. Porter testified that he holds a degree in biology, and that he is a certified OLDEB biologist. He also testified that he has performed thousands of oyster lease assessments since the early 1990s and that he

has extensive experience in assisting marine operators in moving their vessels around oyster leases to avoid causing damage. That he has not been qualified as an expert before is not dispositive. The trial court did not abuse its discretion in finding that, though this case was the first in which Mr. Porter was qualified as an expert, he possessed other relevant and reliable education, experience, and knowledge to give testimony that would assist the trier of fact.

The record also does not reflect that Mr. Porter's testimony was improperly cumulative. Mr. Porter was not only admitted as an expert, but also as a fact witness. He testified that he was called upon by Dr. Cake to dive on the oyster leases, collect standing stock samples, and perform an inspection of the leases' condition. He then went on to testify about his personal observation of the condition of the leases, including the sedimentation and consistency of the mud that had settled over the leases. Finally, he testified that, in his experience in moving large vessels around oyster leases, Captain Williams did not follow proper protocol in operating a vessel around the oyster leases, which was not cumulative to other witnesses' testimony on Captain Williams' failures to adhere to standards set by the United States Coast Guard. The trial court did not abuse its discretion in admitting this testimony.

Finally, that Appellants characterize Mr. Porter's testimony as incredible does not render Mr. Porter's testimony inadmissible as an expert. Mr. Porter's credibility, or lack thereof, was an issue to be determined by the trier of fact. "[T]he trier of fact has great, even vast, discretion in determining the credibility of the evidence." *Duvio v. Specialty Pools Co.*, *L.L.C.*, 2015-0423, p. 25 (La. App. 4 Cir. 6/16/16), 216 So.3d 999, 1016. That the trier of fact determined that Mr. Porter's testimony was credible can only be disturbed if it was manifestly

erroneous or clearly wrong. *Allerton v. Broussard*, 2010-2071, p. 3 (La. 12/10/10), 50 So.3d 145, 146-47.

> "[I]n order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous." *Id*.

A review of the record shows that there was a factual basis for finding Mr. Porter credible, including his experience in the field and his personal observations of the oyster leases, which went unrebutted by Appellants. We, therefore, conclude that the trier of fact's credibility determination was not manifestly erroneous.

### *Dr. Flowers*

In their one-paragraph argument for the inadmissibility of Dr. Flowers' testimony, Appellants argue that Dr. Flowers should have been excluded merely because he was hired to perform a "hatchet job" of Appellants' experts' testimony. They also argue that he testified beyond the scope of his expertise. They conclude that this testimony only served to confuse the jury. We disagree.

Other than making the conclusory statement that Dr. Flowers served only to confuse the jury due to his purpose as a rebuttal witness who did not reach his own expert opinions, Appellants make no argument as to why Dr. Flowers' testimony does not meet the *Daubert* standard. To the contrary, the record reflects that Dr. Flowers was offered as an expert in geology, hydrology, and geography, after testifying that he obtained bachelors, masters, and Ph.D. degrees in geology, in addition to a master's degree in engineering. The record further reflects that Dr. Flowers has taught college courses and been an administrator in the area of earth and environmental sciences for over twenty years.

Dr. Flowers' testimony included detailed descriptions of the reports rendered by Appellants' experts and why their methodologies or conclusions in this matter were not proper. His purpose as a rebuttal witness to refute Appellants' expert witnesses does not render his testimony inadmissible. Rather, the dispositive question is whether his testimony was relevant and reliable. Appellants point to nothing in the record to support the finding that Dr. Flowers' testimony was not relevant and reliable, and the trial court found that his experience and knowledge in his areas of expertise would be of help to the trier of fact in understanding, determining, or clarifying facts in issue. Based on a review of the record before us, we do not find that this was an abuse of discretion.

## IV. Causation

Next, we must determine if the jury erred in finding causation. Appellants argue Appellees failed to prove causation because Appellees did not present sufficient evidence to establish that the grounding of the tugboat caused damage to Appellees' oyster leases, nor did Appellees present experts that scientifically or factually proved this fact. We find this argument lacks merit.

In Louisiana, a duty-risk analysis is applied to prove negligence which requires a plaintiff prove that: (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to the plaintiff; (3) the defendant breached that requisite duty; and (4) the risk of harm was within the scope of protection afforded by the duty breached. *Palermo v. Port of New Orleans*, 2004-1804, pp. 21-22 (La. App. 4 Cir. 1/19/07), 951 So.2d 425, 440 (citing *Faulkner v. The McCarty Corporation*, 2002-1337, p. 4 (La. App. 4 Cir. 6/11/03), 853 So.2d 24, 28). "[T]he first element of proof of a negligence claim is causation." *Id.* "[T]he plaintiff has the burden of proving negligence and causation

24

by a preponderance of evidence." *Cay v. State, Dept. of Transp. and Development*, 631 So.2d 393, 395 (La. 1994). "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, establishes that the fact or causation sought to be proved is more probable than not." *Id.*

"A trial court's finding of causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous." *Watters v. Department of Social Services*, 2008-0977, p. 32 (La. App. 4 Cir. 6/17/09), 15 So.3d 1128, 1152. "The manifest error rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." *Id.*

In the case *sub judice,* the record reveals evidence and testimony that substantiates the jury's finding of causation. In particular, Mr. Dinh, the owner of TMS and the tugboat, admitted the grounding of the tugboat caused damage to Appellee's oyster leases, testifying that "we don't deny we run on the oyster reef." Rather than contest the fact that the grounding incident caused damage to Appellees' oyster leases, Mr. Dinh contested the amount of damages owed for the grounding incident proclaiming, "[y]eah, we do the damage, but not the $9 million." This testimony is an admission of causation. Notably, Appellants' counsel conceded causation in closing argument, as well.

Although Appellants made admissions on the issue of causation, we find that Appellees, through testimony and evidence, met their burden of proof to establish causation, as well. Mr. Melerine and Mr. Molero testified regarding the damage to the oyster leases as a result of the grounding. Mr. Melerine testified that he spent twenty years cultivating his lease to generate superior productivity. Mr. Melerine explained that he and Mr. Robin utilized the method of placing cultch on their reefs

to increase oyster crop productivity and that, in 2016, prior to the grounding, his and Mr. Robin's oyster leases were very lucrative as a result. This testimony was corroborated by Mr. Assavedo, who testified that Mr. Melerine's and Mr. Robin's oyster leases were "the hottest in this bay" and their leases were "a very productive area."

Mr. Melerine also testified that, when he went to help get the tugboat off of his lease, the tugboat was stuck to the extent that it did not float at all, and Captain Williams' efforts to move the tugboat caused "mud and grit" to go everywhere. Mr. Melerine explained that "mud was going everywhere" in areas where solid, hard reef had existed. Mr. Melerine also testified that he took a video showing "plumes of sediment" behind the tugboat as Captain Williams was trying to free it on April 10, 2016.[4]

As a result of the grounding incident, Mr. Melerine testified that his business was drastically impacted. He explained the tugboat grounded on his "best reef" on his "best lease," stating this incident "crippled" his lease. Because his "best reef" was damaged by the grounding incident, Mr. Melerine testified he was forced to "overfish" the rest of his lease in an attempt to save his crop. He explained it took him over six years to get the lease in a productive state, and much longer to return it to "pre-grounding productivity." Similarly, Louis Molero ("Mr. Molero"), an oysterman hired by Mr. Melerine to cultivate his oyster lease, testified that the damage to the oyster lease caused by the grounding incident resulted in financial hardship, and he was forced to work other leases and "over-harvest" areas that were to be developed.

---

[4] In the record before this Court, this video is "Tr. Ex. P-115."

Mr. Assavedo testified that he observed mud "just bubbling, gushing" as the tugboat navigated through the area near Appellees' oyster leases. Mr. Assavedo further explained that, as Captain Williams attempted to move the tugboat once it was grounded, he witnessed the tugboat "prop washing everything." He testified that Captain Williams tried for hours to free the tugboat while it was grounded on Appellees' oyster leases, which he opined caused heavy damage to Mr. Melerine's oyster lease.

Moreover, Appellees' expert, Dr. Cake, testified that the grounding incident moved sediment into the "water column" and the passage of the tugboat displaced the sediment across the oyster leases. Dr. Cake explained that the appearance of the oysters after the grounding incident, which had a "blackened muddy appearance," indicated the oysters died. Based on this observation, he concluded that the loss of oysters in standing stock was caused by the misplaced sediment resulting from the grounding incident.

Similarly, Mr. Porter, who observed the water bottoms of the oyster leases, reported that, during his first dive on the leases, he witnessed severe disturbances to the water bottoms. He testified that he was able to locate the specific area where the grounding incident occurred with the assistance of Automatic Identification System ("AIS") Data.[5] Once the location was detected, he reported that he entered the water to observe the damage and saw significant "depressions, anomalous holes, [and] scarring" in the area of the grounding incident, revealing severe disruptions to the water bottom where the tugboat grounded. He also explained that

---

[5] AIS Data is collected through an onboard navigation safety device that "transmits and monitors the location and characteristics of large vessels…". *See* https://marinecadastre.gov/ais/.

he observed "blackened" sediment, which was an indication that the area was not recovering from the grounding incident.

In addition to the testimonial evidence presented at trial, the record reflects that documentary evidence was introduced at trial that showed the extent of the damage to Appellees' oyster leases after the grounding. Specifically, Sonar imagery captured the sediment recovered from Mr. Porter's dive showing the "blackened" state of the sediment located in the area of the grounding incident, and the large hole at the grounding site. Dr. Cake's and Mr. Porter's expert reports and testimony attributed the damage to Appellees' oyster leases to the grounding incident.

Based on the evidence and testimony presented at trial, the jury found Appellees met their burden of proof necessary to show the grounding incident caused damage to Appellee's oyster leases. Applying the manifest error standard of review, we find the evidence and testimony supports the jury's factual findings. Thus, we find the jury's finding of causation was not manifestly erroneous.

## V.    Motion for New Trial

Next, we address Appellants' assignment of error regarding the trial court's denial of their motion for new trial. Appellants argue the trial court erred in denying their motion for new trial because Appellees, in violation of La. C.E. art. 411, improperly introduced and miscommunicated to the jury that their insurance coverage is $6 million. As such, they argue the jury awarded Appellees an award in excess of $6 million and a new trial should be ordered.

"La. C.C.P. art. 1972 requires a trial court to grant a motion for new trial if it finds that the jury verdict is contrary to the law and evidence." *Zatarain v. WDSU-Television, Inc.*, 1995-2600, p. 3 (La. App. 4 Cir. 4/24/96), 673 So.2d 1181,

28

1183. "Although the granting of a new trial is mandatory under those circumstances, the jurisprudence interpreting the provision recognizes the trial judge's discretion in determining whether the evidence is contrary to the law and evidence." *Id.* "Generally, a trial judge should grant a motion for new trial because a jury verdict is contrary to the law and evidence when the judge's examination of the record, while exercising his discretion, convinces him that the judgment would result in a miscarriage of justice." *Id.* (citing P*erkins v. K-Mart Corp.*, 1994-2065 (La. App. 1 Cir. 6/23/95), 657 So.2d 725, 731, *writ denied*, 1995-2058 (La. 11/13/95), 662 So.2d 477). "Further, a motion for new trial based on a contention that the verdict is contrary to the law and evidence should be denied if the verdict is supportable by any fair interpretation of evidence." *Id.* (citing *Gibson v. Bossier City General Hospital*, 594 So.2d 1332, 1336 (La. App. 2 Cir. 1991). "A trial court judgment denying a motion for new trial should not be reversed unless the appellate court finds that the trial court abused its discretion." *Id.*

Appellants filed a motion for a new trial pursuant to La. C.E. art. 411 arguing that a new trial was warranted because Appellees improperly introduced evidence of their insurance policy limits. La. C.E. art. 411 provides, "[a]lthough a policy of insurance may be admissible, the amount of coverage under the policy shall not be communicated to the jury unless the amount of coverage is a disputed issue which the jury will decide."

In denying Appellants' motion for new trial, the trial court noted the parties stipulated to the insurance policy limits and both parties introduced the policies into evidence. The trial court found that Appellants did not carry their burden to show "prejudicial error" that warranted a new trial. Further, the trial court determined that, even while the policy limits were introduced at trial, a review of

29

the record in totality supports the jury's award and was not "contrary to law and evidence." The trial court also noted the jury made adjustments to Appellees' damages award in accordance with arguments raised by Appellants. Thus, the trial court determined that a new trial was not warranted. We agree.

Louisiana jurisprudence establishes that the party that files a motion for a new trial carries the burden to show that he is entitled to a new trial. *See Jackson v. Wise*, 2017-1062, p. 18 (La. App. 1 Cir. 4/13/18), 249 So.3d 845, 856, Fed. Carr. Cas. P. 84, 903; *See also Porche v. Winn-Dixie Louisiana, Inc.*, 644 So.2d 699 (La. App. 1st Cir. 1994). After reviewing the record, we find that the trial court did not err in finding that Appellants failed to meet their burden. The record reflects that the parties stipulated to the following: (1) the only policy at issue was AGCS's Policy No. OHL 92009215; (2) that the policy had a limit of $1,000,000.00; and (3) this policy "excludes coverage for the punitive damages." These stipulations were read to the jury with no objection from Appellants. Further, Mr. Dinh testified on cross-examination that TMS chartered the tugboat from Triple T Marine, LLC pursuant to the Bareboat Charter, which obligated that TMS maintain $6 million in insurance coverage under the charter agreement. However, Mr. Dinh testified that he only had insurance policies totaling $5 million when the grounding incident occurred in April 2016. The record reflects that Appellants did not object to the line of questioning regarding the insurance limit TMS was obligated to carry. Rather, Appellants objected on the grounds that the policies are "the best evidence on their terms and condition, and the parties have already stipulated as to what limitations and exclusions apply in this case…." This objection was overruled by the trial court. Additionally, the record does not reflect that Appellants objected

to the introduction of this evidence pursuant to La. C.E. art. 411 before or during trial.

Moreover, as the trial court noted in its reasons for judgment, the record reflects Appellants introduced the AGCS policy into evidence. The parties stipulated to the policy limit of $1 million. These stipulations were read to the jury. It is well settled that a party cannot "complain" about the introduction of evidence in which it originally sought to be admissible. *See Bartholomew v. Travelers Insurance Co.*, 290 So.2d 390, 392 (La. App. 4 Cir. 1974).

Thus, we find that trial court did not abuse its discretion in denying Appellants' motion for new trial.

## VI. OFI's Standing

Lastly, Appellants argue that OFI does not have standing to recover damages in this matter as its sublease expired and was not renewed with the new lease, Lease No. 34005-09, and the trial court should have granted their exception of no cause of action as to OFI. Appellants contend that OFI's sublease does not contain any renewal provisions and the sublease should be interpreted within the "four corners" of the document. However, Appellees argue the sublease was subject to a "first right of renewal" after the initial term. Thus, when the original lease was renewed in 2009, the sublease was renewed as well. We agree.

Louisiana law provides for a provisional renewal for oyster leases pursuant to La. R.S. Sec. 56:428, which states:

> A. All leases made under the provisions of this Subpart shall begin on the day the lease is signed and continue for a period of fifteen years. The owners of expiring leases have first right of renewal of their leases. However, this right to renewal shall be subject to the provisions of this Subpart. Leases carry the first right of renewal for successive periods of fifteen years each, provided the

31

lease is capable of supporting oyster populations. Renewals shall be executed by the secretary and shall be made subject to both the provisions of this Subpart and to the rules and regulations established by the department.

B. The secretary has sixty days from the date of expiration of a lease to execute a renewal lease. If a renewal lease is not executed within this sixty-day period, the lease is automatically renewed. In either situation, the fifteen-year period of the renewal lease shall begin on the first day following the expiration date of the prior lease, and the renewal lease shall be assigned the same number used for the prior lease with the addition of a designation to indicate which year the lease was renewed. If a leaseholder wishes to change the configuration of his lease in accordance with the department's rules governing leased areas, a resurvey and plan of the water bottom shall be made by the leaseholder in accordance with the standards required by the department and a copy supplied to the department. The department may resurvey any lease for potential conflicts with department rules and regulations. If the department determines that a resurvey will be conducted, the leaseholder shall be given ten days written notice of the scheduled resurvey by the department and may be present at the resurvey.

Additionally, La. R.S. Sec. 56:426(D) provides, in pertinent part, that:

The renewal or extension of the term of an existing oyster lease **shall not be deemed a new lease**, but a renewal or extension shall be recorded no later than six months after the expiration of the term of the previous lease.

(Emphasis added).

It is undisputed that OFI's sublease was granted under the "original" lease, Lease No. 34005. The "original" lease was renewed in 2009. Pursuant to Louisiana statutory law, OFI's sublease, as an oyster sublease, is subject to a "first right or renewal," which does not require the establishment of a new lease. Given the express language of these statutes, OFI's sublease was renewed when the "original" lease was renewed.

32

Additionally, Mr. Robin, who testified that he has over twenty years of experience in the oyster harvesting industry, testified the sublease was still effective at trial. Mr. Robin testified that oyster leases renew every fifteen years. He explained once an oyster lease is renewed, it does not create a new lease, but is an extension of the original oyster lease that covers the same "boundaries, plaque, and survey" of the original lease. Mr. Robin's testimony was uncontroverted. The "original" lease was effective in 2016, when this grounding incident occurred. As such, OFI's sublease was in effect when the grounding incident occurred. Thus, we find this assignment of error lacks merit.

## DECREE

For the foregoing reasons, we affirm the trial court's judgment awarding Appellees a total of $6,087,701.47 in damages.

**AFFIRMED**